[Crim. No. 2932. Third Dist. Mar. 1, 1960.]

THE PEOPLE, Respondent, v. ROBERT WINSTON
KNOX, Appellant.

Bowers & Sinclair, Landis, Brody & Martin and William A. White for Appellant.

Stanley Mosk, Attorney General, Doris H. Maier and Lloyd Hinkelman, Deputy Attorneys General, for Respondent.

VAN DYKE, P. J.—In this case appellant was charged by information with the commission of two felonies. In Count I he was charged with a "Violation of subsection 3 of section 192 of the Penal Code of the State of California, Manslaughter," in that on or about November 9, 1957, he "did unlawfully kill, without malice, one Rae Southerland while in the operation of a vehicle, and with gross negligence." In Count II he was charged with a violation of section 501 of the Vehicle Code in that on the same occasion he "did drive a vehicle while under the influence of intoxicating liquor and in so driving did an act forbidden by law, which act proximately caused bodily injuries to other persons."

On his pleas of not guilty as to both counts he was tried to a jury which returned a verdict finding him guilty of violation of section 192 of the Penal Code, the jury, however, finding that the act causing death was done without gross negligence. The jury also returned a verdict finding him guilty of a violation of section 502 of the Vehicle Code, a lesser offense included in the charge of a violation of section 501. The court later granted a new trial as to Count II (Veh. Code, § 501), and denied a new trial as to Count I. On his application, the court granted appellant probation, fixing the term at three years, and requiring as a condition thereof that he be imprisoned in the Placer County jail for six months. He has appealed. He was granted release on bail pending appeal.

Appellant contends: (1) that the court committed error in admitting testimony concerning the alcoholic content of his blood at the time of the accident and that the error was not cured by the court's later striking that evidence out and admonishing the jury to disregard it; and (2) that the district attorney was guilty of misconduct in offering the evidence concerning alcoholic content of appellant's blood, knowing as he did so that it was not admissible under the circumstances and knowing that it would be stricken upon motion, but intending, nevertheless, to get the advantage of having first obtained the receipt of that testimony to appellant's prejudice. Appellant also contends that the court erred in denying his motion for a new trial as to said Count I, and, finally, appellant contends that the evidence does not support the verdict.

In the early morning of November 9, 1957, while driving his automobile on Highway 40 between Sacramento and Au-

burn, defendant was involved in an accident near the town of Loomis. Highway 40 in this area runs north and south and appellant was northbound. Just south of Loomis appellant ran his automobile into the back of another northbound car driven by Fred Dominguez, in which four persons were riding, one of whom died as the result of injuries sustained in the collision. In this area the highway is straight, level and confined to two lanes. The weather was good. The road surface was dry. It was a dark night. So far as the testimony disclosed the traffic was light. About one and a half miles south of the point of collision, appellant passed a northbound truck. The truck driver testified that he was traveling about 60 miles an hour when appellant's car passed him and that appellant's passing speed was about 90 miles an hour; that appellant returned to his own proper lane; that the witness had not observed any lights ahead of him, but shortly after appellant's car passed he saw a flare-up of light ahead and soon came upon the scene of the accident.

Appellant testified that about a mile and a half south of the point of collision he passed a truck; that he was then traveling 60 to 65 miles an hour, but accelerated his speed while passing to about 75 miles per hour; that having attained his own lane again after passing he slowed down to 55 to 60 miles an hour; that he noticed something ahead which appeared to be stationary in the road; that he applied his brakes and veered to the left, trying to avoid hitting the object; that the object had no lights on its rear; that the object was the Dominguez car, with which he collided.

Dominguez testified that at the time of the accident he was driving north at a speed of 35 to 45 miles per hour; that although he saw nothing coming up behind him he heard the screeching of brakes and his car was struck and turned over.

A Doctor Bailey was called to the scene of the accident. He testified he observed appellant sitting in his car in a dazed or stuporous condition, with an abrasion on the bridge of his nose and abrasions on one of his knees; that he noticed a strong odor of alcohol on appellant's breath and was of the opinion that he was under the influence of alcohol because of this strong odor, and because, though not seriously injured, he was stuporous and, in the opinion of the physician, did not react appropriately to the situation.

After proof of death, the next chronological step in the receipt of testimony was the swearing as a witness of

Dorothy Hedinger, a nurse, who gave testimony concerning the emergency treatment of the people injured in the collision, including appellant, at the Roseville hospital. When the prosecution began questioning her concerning the taking of a sample of appellant's blood for the purpose of analysis to determine alcoholic content, the following occurred: She was asked if she recalled taking a blood sample that night with Doctor Craig, a staff physician who had been called to the hospital to attend the injured. Appellant's counsel asked permission of the court to examine the nurse on *voir dire* out of the presence of the jury. The jury was excused. Counsel for appellant asked some preliminary questions and the court requested that the purpose of the *voir dire* be disclosed. Counsel replied that there would be a possible contention that the blood sample was taken against the will of the appellant and there might be other questions in connection with unlawful search and seizure; that they wanted to examine the nurse as to the way in which the blood sample had been taken, "the actual physical circumstances of the taking," so that they could determine what objections were available to make to the court. The nurse then testified that Doctor Craig, at a highway patrolman's request for a sample of appellant's blood, took a syringe in his hand which she had prepared and approached appellant who said "I don't want a shot"; that she said to him, "We are not giving you a shot. The Highway Patrol wants a blood sample"; that at that time appellant was on a "gurney" but was not restrained in any way; that he was conscious and was lying with his arm straight out; that it was possible she or another nurse was holding the arm because the gurney had no arm board. She was then asked if prior to the time of the insertion of the needle by Dr. Craig appellant had not told the doctor to get out of there. She answered, "I don't recall that he was that vehement at any time." The following then occurred: "The Court [to Mr. Case, appellant's counsel]: You stated to the Court you had grave doubt as to whether there was an illegal search and seizure here. Mr. Case: That's right. The Court: Let's get to the point and ask the question, so we can determine. Mr. Case: First of all, I was going to the issue of consent, and there is testimony in a preliminary examination as testified to, [by] Dr. Craig, that when approached with the needle Mr. Knox said, 'Get the hell out of here' or words to that effect. I am trying to find out from this witness whether she heard that, because it would go to the element of consent. I also have testimony in the preliminary

examination he was not placed under arrest at the time this blood was withdrawn." The nurse then repeated her statement that appellant had said he did not want a shot, and that she did not recall any protest to the taking of a blood sample other than his statement that he did not want a shot; that when it was explained to him that the highway patrol wanted a sample of blood, he replied: "As long as it is not a shot." Counsel then announced they had no more questions of the witness on *voir dire*. They objected to the admission of the nurse's testimony concerning the blood sample upon the grounds that there had been no showing of consent and no showing that the taking of the blood sample did not constitute unlawful search and seizure. The court and counsel on both sides discussed at length the admissibility of the nurse's testimony. Finally, the court referred to the testimony of the nurse that though the defendant had objected to having a shot administered to him, yet, upon being informed that the highway patrol desired a sample of his blood, he had indicated it was all right as long as he was not being given a shot. The court then ruled that it was permissible for the prosecution to proceed with the witness. Thereupon the jury was returned to the courtroom and the prosecution established the taking of a sample of blood from the appellant and its delivery to a state agency for analysis. The analysis was introduced in evidence and an expert testified in connection therewith that the analysis showed an alcoholic content of .17 and that a person with that alcoholic content was definitely under the influence of intoxicating liquor and would generally be unable to operate a vehicle with the care and caution of an ordinarily prudent man not under the influence of alcohol. We think it clearly appears that the court admitted the evidence concerning the alcoholic content of appellant's blood on the basis of consent, and that the court cannot be said to have erred in so ruling.

At this point Doctor Craig, who had taken the blood sample, was called by the People. He testified that he examined appellant while he was in the hallway of the hospital lying upon a gurney and that he found no serious injuries; that thereafter a blood alcohol sample for examination was requested and he had drawn a sample of blood. He was asked if he had a conversation with appellant and replied that he had not had what he could call a real conversation; that appellant was not talking; that appellant just told him (the doctor) to get away from there. "Q. What words did he use to express, as best you can recall, the exact words of the conversation? A. I

asked him if he hurt anywhere. And as I recall, I don't think he replied or he said 'no'; either didn't reply or said no. In other words, he didn't say much of anything to that question. In fact, he didn't say anything while I was examining him, other than that. When I went to take the sample of blood for the blood alcohol, then he told me to get the hell out of there. . . . Those were the words. . . . I told him it was necessary to take some blood, that we weren't giving him a shot. . . . Q. What was his physical reactions to you at the time you took the blood alcohol? A. I would have to say he wasn't entirely cooperative. Q. What was his conversation during that time, if you recall it? A. He wasn't saying anything when I took the blood.'' Doctor Craig testified appellant had an odor of alcohol on his breath and that he felt from his observation that appellant was under the influence of intoxicating liquor at that time.

Touching the happening of the accident there was testimony that appellant's car had laid down skid marks slightly over 300 feet long which were in his proper travel lane for about 200 or more feet, and which then veered toward the opposite lane to the point of collision. Appellant testified that he was not under the influence of alcohol while driving just prior to the collision although before he started his drive, and over a course of several hours, he had imbibed five or six drinks containing vodka.

Considerable testimony was received concerning whether or not there were rear lights on the Dominguez car. There was testimony that Dominguez had inspected his rear lights before leaving San Francisco for Reno and found them working; that he had stopped at a service station shortly before the collision and that the station attendant observed his rear lights were burning.

After the blood sample, its analysis and the expert testimony based thereon had been admitted as hereinbefore related, it appeared that the officer who arrested appellant had requested the blood sample be taken because from what he had observed and had been told he was in doubt as to whether or not appellant was under the influence of alcohol at the time of the collision, and that he had formed no opinion as to the intoxication of appellant. It appeared also that it was not until after he received the blood analysis that he had arrested appellant and that the arrest occurred nine days after the blood sample was taken.

Considering appellant's contention that the evidence was insufficient to sustain a conviction of violation of sub-

division 3(b) of section 192 of the Penal Code, we think it apparent from what has been said that the evidence, viewed as it must be on appeal in a light most favorable to the respondent, was sufficient to sustain the verdict. On this point a brief summary of the evidence in the light of the rule will be sufficient. Appellant, prior to starting his drive to Auburn, had spent the evening with friends and had imbibed five or six vodka highballs. He passed a truck at a speed of 90 miles per hour. Shortly thereafter, having returned to his own travel lane, he ran into the Dominguez car which was traveling ahead of him at 35 to 45 miles an hour with headlights and taillights burning. He applied his brakes, but was unable to stop before striking the Dominguez car. He laid down over 300 feet of skid marks before the impact. Doctor Bailey, called to the scene, examined him, found he had no serious injuries, that he had a strong odor of alcohol on his breath and that he was in a stuporous condition and did not react appropriately to the situation. The doctor was of the opinion that appellant was under the influence of alcohol. Officer Armbruster, who arrived at the scene and attempted to question appellant, detected an odor of alcohol near his person. Doctor Craig, examining him at the hospital, gave it as his opinion that he was then under the influence of intoxicating liquor. The jury could conclude from the foregoing that appellant operated his automobile in an unlawful manner and that the death of the deceased was the proximate result of his violation of applicable law. The evidence was sufficient to sustain the verdict. (*People* v. *Costa*, 40 Cal.2d 160 [252 P.2d 1]; *People* v. *Hopper*, 168 Cal.App.2d 406 [336 P.2d 28].)

We will now discuss the claims of error. ▉ When the admissibility of the blood sample, the analysis of the sample, and expert testimony concerning the effect upon a driver of an alcoholic blood content of .17 was first approached through the questions asked of the nurse, the trial court adopted proper procedure in granting *voir dire* examination before ruling on the admissibility of her testimony as to the taking of the blood sample. The Supreme Court, in *People* v. *Gorg*, 45 Cal.2d 776, 780 [291 P.2d 469], said:

". . . The procedure adopted by the trial court was proper, for the admissibility of the evidence presented a question of law for the court. (Code Civ. Proc., § 2102; *Steele* v. *United States*, 267 U.S. 505, 511 [45 S.Ct. 417, 69 L.Ed. 761]; *Boyer* v. *United States*, 92 F.2d 857, 858; *Marsh* v. *United States*, 29 F.2d 172, 173; *United States* v. *Jankowski*, 28 F.2d

800, 802; *Pritchett* v. *State,* 78 Okla. Crim. 67 [143 P.2d 622, 624-626]; *State* v. *Wills,* 91 W.Va. 659 [114 S.E. 261, 266, 24 A.L.R. 1398]; *contra, Compton* v. *State,* 148 Tex.Crim. 204 [186 S.W.2d 74, 76].)"

The trial court must often determine issues such as here raised by receiving *voir dire* evidence. The evidence may prove to be conflicting, in which case the court must resolve the conflict. Upon this subject and upon the power of an appellate court to set aside the trial court's determination, we quote the following from *Marsh* v. *United States,* cited by the Supreme Court in *People* v. *Gorg, supra,* the opinion being written by Circuit Judge L. Hand:

"First, however, we must decide whether the search at bar was reasonable, . . . . We are therefore first to determine whether the trooper overhauled the car for violation of a traffic ordinance. Upon that issue we see no reason to disturb the finding of the District Judge, who alone was charged, as we held in *United States* v. *Jankowski,* with the duty of deciding the facts on which the competency of the evidence depended. At the same time we must confess to considerable doubt whether, had the matter been before us in the first instance, we should have come to the same conclusion. The circumstances made the trooper's story somewhat doubtful, and an easy complaisance in any plausible tale may deprive defendants of their constitutional rights. This caution we are not, however, ourselves in a position to exercise, because, except in plain cases, we cannot tell from the cold record where the truth lies. For the future we take this occasion to press upon the District Judges that they search the testimony in such cases with care, remembering that the protection of defendants must in most cases rest finally with them."

It is disclosed by the evidence, which we have hereinbefore stated in considerable detail, that during the examination of the nurse on *voir dire* the question before the court was whether or not the blood sample had been taken with the consent of appellant. Of course, if it had been then appellant could not validly object to the use of the blood analysis in evidence or to the expert testimony as to the effect upon a driver of so much alcohol in his blood. By overruling the objection to the admission of her testimony the trial court impliedly ruled that, upon the evidence before him at that time, the blood sample had been taken with appellant's consent. Although during the argument, after the *voir dire* examination of the nurse had been concluded on both sides, counsel

and the court referred to possible issues concerning search and seizure incident to a lawful arrest, yet it was clear that all realized the nurse's testimony went only, and could go only, to the question of consent. This situation was pointed out by the court when just before ruling the testimony admissible the court said: ''The nurse specifically testified that the defendant did object to having a shot administered to him, but that upon being informed that the Highway Patrolman desired a sample of the blood, he indicated that it was all right as long as he wasn't being given a shot. It would appear that on that basis that it is permissible for the prosecution to proceed with this witness. Is there anything further to be said, or any further objections to be registered in the record, Gentlemen? Mr. Case [Counsel for appellant] : None at this time, no, your Honor.'' The ruling of the court that the testimony presented to it showed that appellant had consented to the taking of the blood sample finds ample support in the *voir dire* testimony of the nurse with the inferences that may be reasonably drawn therefrom. No counter testimony was introduced. Significantly the defendant did not take the stand on *voir dire* and deny consent. The court properly, therefore, admitted the nurse's testimony on the basis of consent and properly admitted thereafter the other evidence as to alcoholic content of the blood and its effect. On this record, therefore, we hold that the court did not commit error in the admission of such evidence, as of the time of its admission.

When it later developed that, had consent to the taking of the blood sample not been given, there was a question as to whether or not the taking could be justified on the basis of a lawful arrest to which the taking was incidental the court received considerable testimony touching those matters, and eventually ruled that the taking had not been incidental to arrest because the arrest had been delayed for some nine days and until the arresting officer had received the analysis of the blood. Upon motion of counsel for the defense the court ordered stricken all of the testimony touching the taking of the blood sample, the analysis of the blood, and the testimony of the expert as to the effect upon appellant's driving ability of the alcoholic content found to have been in his blood, and admonished the jury that they were to disregard all of that testimony.

Although as we have said the trial court properly admitted the testimony, later stricken, because such admission was proper upon the record as it stood when the order of ad-

mission was made, nevertheless it was competent for the trial court to reopen the question of consent if further evidence developed which made it appear that upon all of the facts consent had not been given. The record does not disclose that the trial court expressly did this, but we think it clear that such a reopening of the question is to be implied. When the testimony of Doctor Craig came in that when he approached appellant for the purpose of extracting a blood sample, the appellant had told him to ''get the hell out of here'' the court could, as it impliedly did, conclude that consent had not in fact been given and proceed to ascertain whether or not the taking of the blood sample had been done reasonably and as an incident to a lawful arrest. This further evidence which was taken may be summarized as follows: When Armbruster, the investigating, and later the arresting, officer arrived on the scene he was made aware of the physical facts there apparent which we have already stated, including the skid marks indicating that appellant, having seen a car ahead, had attempted to stop and that his car, after the reaction time necessary for him to apply his brakes had elapsed, had laid down skid marks for over 300 feet and had then struck the Dominguez car with such force as to turn it over. He had received the statement of Doctor Bailey who was still on the scene that his examination of appellant's reactions, plus the strong odor of alcohol on his breath, had caused the doctor to believe him to be intoxicated. The officer himself had smelled alcohol in the car near appellant, although he was not sure that it came from appellant's breath. It does not appear that at that time, knowing these things, he also knew that one of the occupants of the Dominguez car, all of whom had been taken from the scene by ambulance en route to the Roseville Hospital, had died on the way to the hospital. It may be inferred, however, that he knew that in the collision the occupants of the Dominguez car had been injured. He testified as follows: When Mr. Knox had been taken from the scene of the accident in the ambulance I continued my investigation, then I went to the hospital. I saw Dr. Craig and talked to him. I had a conversation with Mr. Dominguez, the driver of the other car, and also with the passengers who were in his car. We think it clear that at the time he requested the blood sample he would have been justified in arresting appellant for a violation of section 501 of the Vehicle Code. Section 836 of the Penal Code provides that a peace officer may make an arrest without a warrant whenever he has reasonable

cause to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed. The knowledge and the information of the officer at that time was ample to meet the statutory test. It is true that at the trial of this cause the officer testified that he had been in doubt as to whether appellant was guilty of a violation of said section 501 of the Vehicle Code. It is not the actual state of the officer's mind that is determinative. It is the circumstances that determine the right to arrest, and if they be such as to constitute reasonable cause for believing that a felony has been committed the officer may arrest, even though he has some doubt about the matter. The officer testified, and it is apparent from the record that he elected not to exercise his right of arrest at that moment, and this conduct on his part was reasonable and commendable. There appeared no necessity for an immediate arrest. Appellant appeared to have been injured, and although Doctor Bailey had stated to the officer that he had examined him and found him not to be seriously injured, nevertheless the withholding of the arrest until appellant could be taken to the hospital for further examination and for necessary treatment if necessity should appear was proper action on the part of the officer of which the appellant cannot complain. We think also that, having obtained the sample of the appellant's blood, the conduct of the officer in submitting it to the state laboratory for analysis, awaiting the return of the analysis before making the arrest was likewise proper action, under the circumstances, of which the appellant cannot complain. As was said in *People* v. *Duroncelay*, 48 Cal.2d 766, 772 [312 P.2d 690]: "Nor should it be ignored that a test of this kind may serve to exonerate, as well as to convict."

Appellant argues that even if the officer might have validly arrested appellant prior to the taking of a sample of his blood and might then have taken the blood without consent of the appellant so long as it was done in a reasonable and medically-approved fashion, and although the taking of the sample might precede the arrest (see *People* v. *Duroncelay, supra*), still the lapse of nine days between the taking of the sample and the making of the arrest was so great that the arrest when actually made could not be related back to the taking of the sample; that to admit the evidence concerning the contents of appellant's blood offended against the constitutional right to be secure from unreasonable searches and seizures.

*State* v. *Kroening*, 274 Wis. 266 [79 N.W.2d 810], relied

on by appellant, presented a state of facts closely comparable to those here. After stating that ''It is well-settled in Wisconsin that a search of the person or of his immediate surroundings made incident to his arrest does not violate this constitutional provision'' the court stated:

''In the case at bar the defendant was not under arrest when his blood was taken nor was he arrested for more than a week afterward. Wisconsin subscribes to the federal rule that evidence obtained by illegal search and seizure is inadmissible upon the trial. [Citing cases.] If, then, the means by which the state came into possession of defendant's blood constituted a search and seizure, not incident to his arrest, it must follow that it was an illegal one, therefore unreasonable, and testimony regarding analysis of the blood was inadmissible.

''. . . . . . . . . . . .

''The State submits that where probable cause exists to arrest the driver without warrant, the fact that the search *preceded* the arrest is immaterial and does not prevent the search from being incident to the arrest. The statement of facts in the report of the learned trial court hardly warrants the assumption that there was probable cause to arrest Kroening without warrant, but we pass that and observe only that he was not arrested until nine days after the accident. If we were to indulge in speculation, it would seem most likely that it was the result of the blood analysis rather than anything else which supplied the probable cause. While the attorney general correctly says that a search and seizure which is incidental to a lawful arrest does not violate the constitutional rights of the person searched, the lapse of time between the search and the arrest is important and in some cases, as this, vital in determining whether the search is incident to the arrest. . . . The time interval in the instant case, in the absence of any enlightenment contained in the facts reported by the trial court, is far too long for us to accept the State's suggestion that this search and seizure was incident to the arrest of defendant.''

But here we have this situation: The trial court could properly conclude, as it impliedly did that, in view of the additional evidence taken after it had first admitted evidence of the alcoholic content of appellant's blood, the sample had been taken without his consent; that the admissibility of the evidence had to depend in the last analysis upon the taking having been incidental to a lawful arrest; and that in view of

the officer's testimony that he was in doubt when he ordered the sample taken that appellant had been guilty of a violation of section 501 of the Vehicle Code, and of the lapse of nine days during which the officer waited for the analysis, the arrest, though lawful when made, was not so connected with the taking of the blood sample that the taking was incidental to the arrest; that, as suggested in *State* v. *Kroening,* the arrest was more reasonably to be related to the result of the analysis. We do not say, as the Wisconsin court apparently did, that the lapse of nine days between search and arrest is enough, standing alone, to compel a holding that the search could not have been incidental to the arrest. We hold that the delay is a material factor to be considered by the court and that in this case that factor, together with the other factors present, afforded substantial support for the court's determination that the search was not incidental to the arrest. We hold that the trial court could, as it did, conclude that there had been no consent; that the taking was not incidental to the arrest; and that therefore the evidence ought not to have been introduced. The court acted properly, therefore, when on motion of appellant's counsel at the trial it ordered the testimony stricken and admonished the jury to disregard it.

 Appellant contends strongly that the court, having finally determined that the evidence ought not to have been admitted and that it was properly subject to a motion to strike, committed error when it refused appellant's motion for a mistrial and likewise committed error when it refused appellant's motion for new trial. Appellant argues that the effect of the testimony concerning the taking of the blood sample, the analysis thereof, and the testimony of the expert explanatory of the effect of so much alcohol in the blood was so damaging to his side of the case that he was unfairly tried; that the admonition of the court could not make the trial fair. Appellant cites a number of cases holding that the damaging effect of such testimony cannot be substantially lessened by an admonition. (See *People* v. *Tarantino,* 45 Cal.2d 590 [290 P.2d 505] ; *People* v. *Carswell,* 149 Cal.App.2d 395 [308 P.2d 852] ; *People* v. *Orcalles,* 32 Cal.2d 562 [197 P.2d 26] ; *People* v. *Hardy,* 33 Cal.2d 52 [198 P.2d 865] ; *People* v. *Wochnick,* 98 Cal.App.2d 124 [219 P.2d 70] ; *People* v. *Bentley,* 131 Cal. App.2d 687 [281 P.2d 1].) On this subject we quote from *People* v. *Hardy, supra,* at page 61:

". . . Under ordinary circumstances the trial court is permitted to correct an error in admitting improper evidence by ordering it stricken from the record and admonishing the jury to disregard it, and the jury is presumed to obey the instruction. (*People* v. *Prather,* 134 Cal. 436, 439 [66 P. 589, 863]; *People* v. *Sourisseau,* 62 Cal.App.2d 917, 929 [145 P.2d 916].) ▆ However, as was stated in *People* v. *McKelvey,* 85 Cal.App. 769, at page 771 [260 P. 397], 'It has also been held that in certain cases where the incompetent evidence goes to the main issue and where the proof of defendant's guilt is not clear and convincing, that the error in admitting the incompetent evidence cannot be cured by striking out and instructing the jury to disregard that evidence.' "

▆ We have come to the conclusion, in view of all of the circumstances shown by the record that the situation is one where the court could and did cure the wrong by striking out the improper evidence and admonishing the jury to disregard it. Appellant was convicted of manslaughter, the unlawful killing of a human being without malice, in the commission of an unlawful act not amounting to felony. His being under the influence of alcohol at the time, while not essential to his guilt, was most persuasive evidence. But appellant's condition as to sobriety was not proved by the blood analysis alone. There was much other evidence on the point. Two doctors gave it as their opinion that he was under the influence of alcohol. They were qualified experts and trained observers. Appellant's own testimony was that over some period of time he had imbibed five or six drinks containing vodka before he began to drive.

Turning now to evidence of guilt aside from appellant's sobriety, we find strong support for the verdict. The way in which the accident happened was amply sufficient we think to convince the jury that appellant was guilty of manslaughter. It is difficult to see how a man driving as fast as he must have been driving in the dark of the night could collide with such force with a car moving ahead of him on the highway without himself having been guilty of negligence. We think this to be a case where the admission of the improper evidence did not deny to appellant a fair trial.

▆ There is no merit in appellant's contention as to misconduct of the prosecuting attorney. The admissibility of the evidence as to the amount of alcohol in appellant's blood was a matter of such uncertainty that it was proper for the prosecutor to submit the issue to the court.

The judgment appealed from is affirmed as is the order denying a new trial.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied March 29, 1960, and appellant's petition for a hearing by the Supreme Court was denied April 26, 1960.