[Crim. No. 6008. In Bank. June 21, 1957.]

THE PEOPLE, Respondent, v. PAUL J. DURONCELAY, Appellant.

Donald R. Fretz, Public Defender (Merced), for Appellant.

Edmund G. Brown, Attorney General, Doris H. Maier and James M. Sanderson, Deputy Attorneys General, for Respondent.

GIBSON, C. J.—Defendant was convicted by a jury of violating section 501 of the Vehicle Code which provides that one who drives an automobile while under the influence of intoxicating liquor and causes personal injury is guilty of a felony.

The accident happened at about 10 p. m. as defendant was driving his automobile in a westerly direction on Yosemite Avenue in Merced County. A boulevard stop sign for westbound traffic was located at the intersection where Yosemite Avenue terminated, and, directly across the intersection, there was a "reflectorized" warning sign on the bank of an irrigation ditch. Defendant's automobile went through the intersection and collided with the bank of the ditch, knocking down the warning sign. An eyewitness testified that the automobile was "going pretty fast" and that there was no illumination from its brake lights to indicate that the brakes had been applied. There was also evidence that there were no skid marks on the road.

Kenneth Riggs, who owned an ambulance and held the position of coroner, drove his vehicle to the scene of the accident and found that defendant was unconscious and that one of two men riding with defendant was injured. The three men were sitting in the front seat of the automobile, and the passenger farthest to the right had a wine bottle in one hand and a can of beer in the other. There were beer cans on the floor of the automobile, and each of the men had an odor of alcohol on his breath. A highway patrolman who arrived at the scene before the ambulance departed and who conducted an investigation noticed that there was an odor of alcohol in the car.

Defendant was taken to a hospital, and, after he regained consciousness, he vomited matter which had a strong smell of alcohol. Riggs, the ambulance driver, had been requested by the highway patrol officer to obtain a sample of blood from defendant to be used for an alcohol test, and he asked defendant whether he consented to having the sample taken, informing him that it would be used for such a test. According

to Riggs, defendant, who was "quite sick at the time and throwing up," did not give a negative answer, and, to the best of his knowledge, Riggs received an answer to take the sample, although he could not recall "the exact words, or that it actually was a yes." When a nurse approached with a needle, defendant withdrew his arm, and Riggs held the arm while she extracted the blood. On cross-examination Riggs was questioned on the subject of defendant's consent and testified as follows:

Q. . . . I believe you said that you did not get a negative answer and you therefore assumed that you got an affirmative answer, is that right?

A. Yes, I think I did say it just about like that. I can't recall. He was not in any condition to come out and say, "Yes, go ahead and take a blood alcohol." He couldn't say that much because he didn't say that many words all the time he was in the hospital. . . .

Q. . . . would you assume therefore that he could answer yes or no?

A. Yes, with a little prodding he could, because it took about 30 minutes to get who he was and where he was from. . . .

Q. And I think that it is your testimony therefore that he did not say yes, is that right?

A. No, I would say that he did not say no.

Q. Well, could you say that he did say yes?

A. I took it, and so I would say that he said yes, or I wouldn't have taken it. . . .

Q. . . . you did not get an affirmative answer, is that right?

A. I still won't say that he said—if he said, "No," the blood alcohol wouldn't have been taken.

Q. Well, I understand that it is your position that he didn't say no. Did he say yes?

A. Well, I tell you, between the holding of the pan and the bottle and his heaving, I can't tell that he said yes, but I would say that he didn't say no.

The nurse who extracted the blood testified that, when defendant was asked for his consent, he gave no answer.

The blood sample taken from defendant had an alcohol content of .22 per cent. A criminologist testified that everyone is under the influence of alcohol when the alcohol content in his blood reaches .15 per cent and that, in his opinion, the person from whom the sample was taken was no longer

capable of operating a motor vehicle with his normal degree of skill and judgment.

██ We are of the opinion that the only reasonable conclusion permitted by the testimony of Riggs and the nurse who assisted him in taking the blood sample is that, when asked for his permission, defendant made no verbal response to indicate whether he consented or refused. Because of defendant's condition, it would have been extremely difficult for him to give an answer, but, when the nurse approached him with the needle, he reacted by withdrawing his arm.* Under the circumstances, a finding that defendant consented is unwarranted, and we must therefore determine whether the results of the blood test were admissible in the absence of defendant's consent to the taking of the sample.

██ It is settled by our decision in *People* v. *Haeussler,* 41 Cal.2d 252, 257 [260 P.2d 8], that the admission of the evidence did not violate defendant's privilege against self-incrimination because the privilege relates only to testimonial compulsion and not to real evidence. ██ We also held in the Haeussler case that the taking of the defendant's blood for an alcohol test in a medically approved manner did not constitute brutality or shock the conscience and that, therefore, the defendant had not been denied due process of law under the rule applied in *Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396]. This holding is in accord with the recent decision of the United States Supreme Court in *Breithaupt* v. *Abram,* 352 U.S. 432 [77 S.Ct. 408, 1 L.Ed.2d 448], where blood for an alcohol test was taken by a doctor while the defendant was unconscious. The court pointed out that blood tests had become routine in everyday life and concluded that "a blood test taken by a skilled technician is not such 'conduct that shocks the conscience,' Rochin, *supra* (342 U.S. at 172), nor such a method of obtaining evidence that it offends a 'sense of justice,' *Brown* v. *Mississippi,* 297 U.S. 278, 285, 286 [56 S.Ct. 461, 80 L.Ed. 682]." There is no claim in the present case that the blood sample was not withdrawn in a medically approved manner. The blood was extracted by a registered nurse, and her testimony shows that she sterilized defendant's arm and used sterilized instruments.

---

*It is clear from the record that the trial court did not admit the results of the alcohol test on the basis of a finding that defendant had consented to the blood test but on the theory that, even if there was no consent, the evidence was admissible under our decision in *People* v. *Haeussler,* 41 Cal.2d 252 [260 P.2d 8].

The question remains as to whether the taking of defendant's blood constituted an unreasonable search and seizure in violation of his constitutional rights. We did not decide that question in *People* v. *Haeussler,* 41 Cal.2d 252 [260 P.2d 8], because its determination was not necessary in view of the rule then followed in this state that illegally obtained evidence was admissible. Nor was it decided in *Breithaupt* v. *Abram,* 352 U.S. 432 [77 S.Ct. 408, 1 L.Ed.2d 448], for the reason that New Mexico, where the judgment under review had been entered, permitted introduction of such evidence. The question is now squarely before us, however, since, subsequent to our decision in the Haeussler case, we adopted the exclusionary rule in *People* v. *Cahan,* 44 Cal.2d 434, 445 [282 P.2d 905].

It is obvious from the evidence that, before the blood sample was taken at the request of the highway patrolman, there was reasonable cause to believe that defendant had committed the felony of which he was convicted, and he could have been lawfully arrested at that time. (Pen. Code, § 836.) There is no claim that defendant was not arrested within a reasonable time or that the arrest was not made on the basis of the facts known to the officer who investigated the accident, and we must presume that there was a lawful arrest, in the absence of any showing to the contrary. (*People* v. *Farrara,* 46 Cal.2d 265, 268-269 [294 P.2d 21]; *People* v. *Beard,* 46 Cal.2d 278, 280 [294 P.2d 29]; see Code Civ. Proc., § 1963, subds. 15, 33.) Where there are reasonable grounds for an arrest, a reasonable search of a person and the area under his control to obtain evidence against him is justified as an incident to arrest, and the search is not unlawful merely because it precedes, rather than follows, the arrest. (*People* v. *Simon,* 45 Cal.2d 645, 648-649 [290 P.2d 531]; *People* v. *Boyles,* 45 Cal.2d 652, 655 [290 P.2d 535]; *People* v. *Martin,* 45 Cal.2d 755, 762 [290 P.2d 855].) Under the circumstances, a search, for example, of defendant's pockets or his automobile to obtain additional evidence of the offense would have been proper, regardless of whether he consented thereto. The question to be determined here is whether the taking of a sample of his blood for an alcohol test was a matter of such a different character that it must be regarded as an unreasonable search and seizure.

As we have seen, the extraction of defendant's blood was accomplished with medical precautions by a registered nurse, and it is settled that such conduct is not brutal or

shocking. Defendant does not challenge the accuracy of the alcohol test, and it merits emphasis that, while the accounts of eyewitnesses are often uncertain and conflicting on the issue of intoxication, blood alcohol tests are so subject to reliable scientific analysis that 23 states have enacted statutes sanctioning the use of such tests. (See *Breithaupt* v. *Abram,* 352 U.S. 432 [77 S.Ct. 408, 1 L.Ed.2d 448, 451-452, fn. 3].) ■ Nor should it be ignored that a test of this kind may serve to exonerate, as well as to convict.

The incidence of death and serious injury on the highways has undeniably assumed tragic dimensions and has been due in a significant degree to the effects of alcohol upon drivers. (See National Safety Council Accident Facts—1955, pp. 43-71.) So long as the measures adopted do not amount to a substantial invasion of individual rights, society must not be prevented from seeking to combat this hazard to the safety of the public. ■ The extraction of blood for testing purposes is, of course, an experience which, every day, many undergo without hardship or ill effects. When this fact, together with the scientific reliability of blood alcohol tests in establishing guilt or innocence, is considered in the light of the imperative public interest involved, the taking of a sample for such a test without consent cannot be regarded as an unreasonable search and seizure where, as here, the extraction is made in a medically approved manner and is incident to the lawful arrest of one who is reasonably believed to have violated section 501 of the Vehicle Code.

We conclude that there was no violation of defendant's rights and that the results of the alcohol test were properly admitted in evidence.

The judgment and the order denying a new trial are affirmed.

Shenk, J., Traynor, J., Schauer, J., Spence, J., and McComb, J., concurred.

CARTER J.—I dissent.

I am of the opinion that the taking of the blood sample for a blood alcohol test in the absence of consent by defendant constituted an unreasonable search and seizure in violation of his constitutional rights. I feel that the taking of blood from defendant is a far different thing from the search of his car at the time of the accident. The available evidence leads to the inference that rather than consenting,

defendant tried to refuse to permit the blood sample to be taken.

In *People* v. *Haeussler*, 41 Cal.2d 252 [260 P.2d 8], in which I dissented, the question of unreasonable search and seizure was not decided. I was of the opinion there, as I am here, that the taking of such a blood sample for the purpose of obtaining evidence to be used against the nonconsenting person is both a deprivation of due process and an unreasonable search and seizure in violation of both the federal and state Constitutions. The only justification for taking blood from a person who does not consent thereto is that it is deemed necessary by competent medical personnel in order to save the person's life. Taking of a blood specimen from a nonconsenting person to obtain evidence which may be used against him is also a denial of the privilege against self-incrimination.

In *Breithaupt* v. *Abram*, 352 U.S. 432 [77 S.Ct. 408, 1 L.Ed.2d 448], on which the majority relies here, Mr. Chief Justice Warren dissented with Mr. Justice Black and Mr. Justice Douglas concurring. Mr. Chief Justice Warren said:

"The judgment in this case should be reversed if *Rochin* v. *California*, 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396],* is to retain its vitality and stand as more than an instance of personal revulsion against particular police methods. I cannot agree with the Court when it says, 'we see nothing comparable here to the facts in Rochin.' It seems to me the essential elements of the cases are the same and the same result should follow.

"There is much in the Court's opinion concerning the hazards on our nation's highways, the efforts of the State to enforce the traffic laws and the necessity for the use of modern scientific methods in the detection of crime. Everybody can agree with these sentiments, and yet they do not help us particularly in determining whether this case can be distinguished from Rochin. That case grew out of police efforts to curb the narcotics traffic, in which there is surely a state interest of at least as great magnitude as the interest in highway law enforcement. Nor does the fact that many

---

*This case originated in California. A majority of this court held that Rochin's constitutional rights had not been invaded. Mr. Justice Schauer and I dissented from the denial of a petition for hearing (*People* v. *Rochin*, 101 Cal.App.2d 140, 143, 149 [225 P.2d 1, 913]). The United States Supreme Court reversed the District Court of Appeal (*Rochin* v. *California*, 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396]).

States sanction the use of blood test evidence differentiate the cases. At the time Rochin was decided illegally obtained evidence was admissible in the vast majority of States. In both Rochin and this case the officers had probable cause to suspect the defendant of the offense of which they sought evidence. In Rochin the defendant was known as a narcotics law violator, was arrested under suspicious circumstances and was seen by the officers to swallow narcotics. In neither case, of course, are we concerned with the defendant's guilt or innocence. The sole problem is whether the proceeding was tainted by a violation of the defendant's constitutional rights.

"In reaching its conclusion that in this case, unlike Rochin, there is nothing 'brutal' or 'offensive' the Court has not kept separate the component parts of the problem. Essentially there are two: the character of the invasion of the body and the expression of the victim's will; the latter may be manifested by physical resistance. Of course, one may consent to having his blood extracted or his stomach pumped and thereby waive any due process objection. In that limited sense the expression of the will is significant. But where there is no affirmative consent, I cannot see that it should make any difference whether one states unequivocally that he objects or resorts to physical violence in protest or is in such condition that he is unable to protest. The Court, however, states that 'the absence of conscious consent, without more, does not necessarily render the taking a violation of a constitutional right.' This implies that a different result might follow if petitioner has been conscious and had voiced his objection. I reject the distinction.

"Since there clearly was no consent to the blood test, it is the nature of the invasion of the body that should be determinative of the due process question here presented. The Court's opinion suggests that an invasion is 'brutal' or 'offensive' only if the police use force to overcome a suspect's resistance. By its recital of the facts in Rochin—the references to a 'considerable struggle' and the fact that the stomach pump was 'forcibly used'*—the Court finds Rochin distinguishable from this case. I cannot accept an analysis that would make physical resistance by a prisoner a prerequisite to the existence of his constitutional rights.

"Apart from the irrelevant factor of physical resistance,

---

*Actually, the struggle in Rochin occurred in the defendant's home after the officers had broken in. He was arrested and taken to a hospital, and there was no evidence that he struggled there.

the techniques used in this case and in Rochin are comparable. In each the operation was performed by a doctor in a hospital. In each there was an extraction of body fluids. Neither operation normally causes any lasting ill effects. The Court denominates a blood test as a scientific method for detecting crime and cites the frequency of such tests in our everyday life. The stomach pump too is a common and accepted way of making tests and relieving distress. But it does not follow from the fact that a technique is a product of science or is in common, consensual use for other purposes that it can be used to extract evidence from a criminal defendant without his consent. Would the taking of spinal fluid from an unconscious person be condoned because such tests are commonly made and might be used as a scientific aid to law enforcement?

"Only personal reaction to the stomach pump and the blood test can distinguish them. To base the restriction which the Due Process Clause imposes on state criminal procedures upon such reactions is to build on shifting sands. We should, in my opinion, hold that due process means at least that law-enforcement officers in their efforts to obtain evidence from persons suspected of crime must stop short of bruising the body, breaking skin, puncturing tissue or extracting body fluids, whether they contemplate doing it by force or by stealth."

Mr. Justice Douglas, with whom Mr. Justice Black joined, wrote, in addition, a separate dissenting opinion in which he said:

"The Court seems to sanction in the name of law enforcement the assault made by the police on this unconscious man. If law enforcement were the chief value in our constitutional scheme, then due process would shrivel and become of little value in protecting the rights of the citizen. But those who fashioned the Constitution put certain rights out of the reach of the police and preferred other rights over law enforcement.

"One source of protection of the citizen against state action is the Due Process Clause of the Fourteenth Amendment. Our decisions hold that the police violate due process when they use brutal methods to obtain evidence against a man and use it to convict him. *Rochin* v. *California*, 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396]; *Chambers* v. *Florida*, 309 U.S. 227 [60 S.Ct. 472, 84 L.Ed. 716]. But the conception of due process is not limited to a prohibition of the use of force and violence against an accused. In

*Leyra* v. *Denno*, 347 U.S. 556 [74 S.Ct. 716, 98 L.Ed. 948], we set aside a conviction where subtle, nonviolent methods had been used to exact a confession from a prisoner. For it was obvious that coercion might be the product of subtlety as well as of violence. We should take the same libertarian approach here.

"As I understand today's decision there would be a violation of due process if the blood had been withdrawn from the accused after a struggle with the police. But the sanctity of the person is equally violated and his body assaulted where the prisoner is incapable of offering resistance as it would be if force were used to overcome his resistance. In both cases evidence is used to convict a man which has been obtained from him on an involuntary basis. I would not draw a line between the use of force on the one hand and trickery, subterfuge, or any police technique which takes advantage of the inability of the prisoner to resist on the other. Nor would I draw a line between involuntary extraction of words from his lips, the involuntary extraction of the contents of his stomach, and the involuntary extraction of fluids of his body when the evidence obtained is used to convict him. Under our system of government, police cannot compel people to furnish the evidence necessary to send them to prison. Yet there is compulsion here, following the violation by the police of the sanctity of the body of an unconscious man.

"And if the decencies of a civilized state are the test, it is repulsive to me for the police to insert needles into an unconscious person in order to get the evidence necessary to convict him, whether they find the person unconscious, give him a pill which puts him to sleep, or use force to subdue him. The indignity to the individual is the same in one case as in the other, for in each is his body invaded and assaulted by the police who are supposed to be the citizen's protector."

The views expressed by Mr. Chief Justice Warren and Mr. Justice Douglas are particularly applicable to the case at bar. Here we do not have an unconscious person but one who, with the only strength he had, tried to refuse to have the blood test taken. A majority of this court is of the opinion, however, that since the blood sample was taken with all medical precautions the conduct of the law enforcement officers was neither brutal nor shocking and, as in the Breithaupt case, because blood tests are everyday occurrences which are undergone by persons consenting thereto for one reason or another, there is nothing wrong with a blood test

taken from one who either does not consent or is incapable of making his wishes known. I do not agree and the time will come when this court will be forced by the Supreme Court of the United States to revamp its theories on this subject as it has been forced to do in the past in other instances. (*Rochin* v. *California*, 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396].)

It appears to me that this case illustrates the whittling-down process which a majority of this court has engaged in since the Cahan case was decided. (*People* v. *Cahan*, 44 Cal.2d 434, 445 [282 P.2d 905].) Prior to the Cahan case I had long advocated the inadmissibility of evidence illegally obtained, and finally a majority of this court saw fit to adopt the view that evidence so obtained was not admissible. However, by its holding here that evidence obtained by force from a nonconsenting person was not unlawfully obtained, the salutary rule of the Cahan case is evaded.

As I said in my dissenting opinion in *People* v. *Haeussler*, 41 Cal.2d 252, 263, 265 [260 P.2d 8], "Because I believe in the dignity and security of the individual and agree with the framers of the Bill of Rights that 'the right of the people to be secure in their *persons,* houses, papers, and effects, against unreasonable searches and seizures,' should 'not be violated,' (emphasis added). I cannot sanction the conduct of the prosecution officers in this case, and would, therefore, reverse the judgment."

For the foregoing reasons I would reverse the judgment.