378

THE PEOPLE OF PUERTO RICO, Petitioner, *v.* SUPERIOR COURT OF PUERTO RICO, SAN JUAN PART, JOAQUÍN CORREA SUÁREZ, Judge, Respondent.

No. 2869. Decided January 17, 1962.

J. B. *Fernández Badillo*, Solicitor General, and *Nilita Vientós Gastón*, Assistant Solicitor General, for petitioner. S. L. *Lagarde Garcés* for defendant.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Dávila.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

The crime of operating a motor vehicle while intoxicated was specifically incorporated into our penal statute by the adoption of § 13 of Act No. 279 of April 5, 1946 (Sess. Laws, pp. 598, 636),[1] 9 L.P.R.A. § 183. On April 1, 1953 the Governor of Puerto Rico addressed the Legislative Assembly in a message expressing his "deep concern regarding the alarming proportions reached by the increasing number of automobile accidents that have been occurring on the highways," and he stated that "the government could prevent a number of such accidents by making the laws which penalize careless driving more severe." Among other general norms he proposed that "any person guilty of the crime of driving a motor vehicle while intoxicated be sentenced to jail, without the alternative of a fine." [2] These executive suggestions were carefully considered and it was concluded that "the proper thing to do before enacting said legislation was to

---

[1] This section was amended by Act No. 156 of April 26, 1951 (Sess. Laws, p. 368) to the sole effect of raising the minimum fine from twenty-five to one hundred dollars upon conviction.

Among the provisions to regulate the issuance of licenses to motor vehicles and to drivers and chauffeurs thereof, Act No. 55 of April 27, 1942 (Sess. Laws, p. 526) contained paragraph / of § 4 which provided that "no person shall drive a motor vehicle while intoxicated." Act No. 75 of April 13, 1916 (Sess. Laws, p. 140) made no express reference. as to driving motor vehicles while intoxicated. See *People v. De Jesús*, 18 P.R.R. 923 (1912).

[2] Journal of Proceedings 1718, tome 3, vol. II (1953).

make the necessary studies and investigations in order to establish in our legislation scientific procedures whereby the degree of intoxication of the offenders could be determined so that the courts could avail themselves of all such additional *means of evidence* as could insure the rights of the innocent citizen, and to provide the community and the state with *the means leading to the conviction* of the guilty ones." [3] (Italics ours.) As a result of the legislative study and for the purpose announced of reconciling the interest of the community with the guarantee of the citizens' rights against possible excesses in the application of the law, Act No. 95 was approved on June 29, 1954 (Sess. Laws, p. 992), the principal innovation of which consisted in introducing the system of chemical analysis to determine the degree of alcoholic intoxication of the drivers. [4] The procedure for taking the samples was established and determinations were made in respect to the probatory effect of the findings of said tests. [5]

---

[3] Report of the Special Traffic Committee on H. B. No. 1250, which later became Act No. 95 of June 29, 1954. Journal of Proceedings 1486, tome 3, vol. IV (1954).

[4] In relation to the constitutionality of the statutes authorizing chemical analysis to determine the degree of alcoholic intoxication, see as to self-incrimination: *Breithaupt* v. *Abram*, 352 U.S. 432 (1957); *Blackford* v. *United States*, 247 F.2d 745 (C.A. 9, 1957); *United States* v. *Nesmith*, 121 F.Supp. 758 (D.C. D.C. 1954); *People* v. *Conterno*, 339 P.2d 968 (Cal. 1959); *State* v. *Smith*, 91 A.2d 188 (Del. 1952); *State* v. *Titak*, 144 N.E.2d 256 (Ohio 1955); *Marshall* v. *State*, 262 S.W.2d 491 (Texas 1953); as to the due process of law: *State* v. *Berg*, 259 P.2d 261 (Ariz. 1953); *People* v. *Duroncelay*, 312 P.2d 690 (Cal. 1957); *People* v. *Kiss*, 269 P.2d 924 (Cal. 1958); as to unlawful searches: *Lebel* v. *Swincicki*, 93 N.W.2d 281 (Mich. 1958); *State* v. *Kroening*, 79 N.W.2d 810 (Wis. 1956). In general, see Annot., *Requiring submission to physical examination or test as violation of constitutional rights*, 25 A.L.R.2d 1407 (1952) and 164 A.L.R. 967 (1946); *Chemical Tests for Intoxication*, Crim. L. Rev. 5 and 73 (1961); *Admissibility of Compulsory Blood Alcohol Tests*, 6 Hast. L. J. 212, 214–217 (1955); *Constitutionality of Compulsory Chemical Tests to Determine Intoxication*, 49 J. Crim. Law, Crim. & P. S. 58 (1958); *The Compulsory Use of Chemical Test for Alcoholic Intoxication: A Symposium*, 14 Md. L. Rev. 111 (1954), W. L. Rev. 203–209 (1958).

[5] The Act, insofar as pertinent, provided that:
"For the purposes of this section, (a) proof to the effect that at the moment of the analysis there was in defendant's blood 5/100 of one per-

Section 5–801 of the Vehicle and Traffic Law of 1960, 9 L.P.R.A. § 1041(a), which essentially [6] follows the wording of § 11–902 of the Uniform Vehicle Code,[7] provides that:

"(a) It shall be unlawful for any person who is under the influence of intoxicating liquor to drive or operate any motor vehicle. All violations of this provision shall be heard in the corresponding part of the Superior Court by a court without a jury.

"(b) In any criminal prosecution for a violation of paragraph (a) above, relating to driving a vehicle while under the influence of intoxicating liquor, the amount of alcohol in the defendant's blood at the time alleged as shown by chemical analysis of the defendant's blood, urine, or breath, *shall give rise to the following presumptions:*

"(1) If there was at the time of the analysis five (5) hundredths of one (1) per cent, or less, by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was not under the influence of intoxicating liquor at the time of the alleged violation.

"(2) If there was at the time of the analysis in excess of five (5) hundredths of one (1) per cent but less than fifteen (15) hundredths of one (1) per cent by weight of alcohol in the defendant's blood, such fact shall not give rise to any presumption that the defendant was or was not under the influence of intox-

---

cent, or less, of alcohol by weight, shall constitute prima facie evidence that defendant was not intoxicated or under the effects of .intoxicating beverages; (*b*) the fact that at the moment of the analysis there was found in defendant's blood more than 5/100 of one per cent; but less than 15/100 of one per cent of alcohol by weight, shall constitute relevant proof, but shall not be prima facie evidence of whether or not defendant was intoxicated or under the effects of intoxicating beverages; and (*c*) the fact that at the moment of the analysis there was in his blood 15/100 of one per cent, or more, of alcohol by weight, shall be admitted as prima facie evidence that defendant was intoxicated or under the effects of intoxicating beverages."

[6] The only important difference is that the Uniform Vehicle Code admits in all cases the presentation of any other reliable evidence to determine that the defendant was or was not under the influence of intoxicating liquor at the time of the alleged violation, while the local law merely allows the presentation of said evidence when the result of the analysis showed more than five hundredths of one per cent by weight of alcohol.

[7] National Safety Council, Uniform Vehicle Code, Act V (1952).

icating liquor, but such fact may be considered jointly with other competent evidence in determining the guilt or innocence of the defendant.

"(3) If there was at the time of the analysis fifteen (15) hundredths of one (1) per cent or more by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was under the influence of intoxicating liquor at the time of the alleged violation.

"(4) The provisions of paragraphs (2) and (3) of this subsection shall not be construed as limiting the introduction of any other competent evidence bearing upon the question of whether or not the defendant was under the influence of intoxicating liquor at the time of the alleged violation." (Italics ours.)

 In the case at bar we considered the third contention presented during the last few months as to whether or not an information formulated under this section was proper and whether or not it was sufficient. In *Acevedo* v. *Superior Court*, judgment of October 18, 1961, we held that in the case of a driver who refuses to have a blood sample taken for chemical analysis, the departure from the procedure pointed out in § 5-804, 9 L.P.R.A. § 1044, does not bar the criminal action. On December 20 last we held in *People* v. *Vargas ante*, p. 216, that it is not necessary to allege that the defendant was driving a motor vehicle under the influence of intoxicating liquor *on a public road*. We must now determine whether in an information for violation of § 5-801(a) quoted above it is necessary to allege that the result of the chemical analysis exceeded five hundredths of one per cent, by weight of alcohol.

This section regarding the probatory value of the chemical analysis has been incorporated by all the states of the Union and the District of Columbia.[8] Although there exist different characteristics among the individuals as to the manner of absorbing and eliminating alcohol, scientific research and experience have established that alcoholic analysis of the blood

---

[8] Boyd, *An Analysis of the Drunken Driving Statutes in the United States*, 8 Vand. L. Rev. 888 (1955).

offer an accurate and consistent means of measuring the effects of liquor on a person.[9] This method has the approval of the American Medical Association, the National Safety Council, the American Bar Association, and the President's Highway Conference.[10] The primary purpose of these provisions is to establish standards[11] to determine whether the defendant was under the influence of intoxicating liquor, and thus eliminate the requirement of expert testimony. 46 J. Crim., Crim. L. & P. S. 72, 75 (1955). Thus, it is a case in which objective evidence substitutes opinion evidence. In some commentaries which appear in Vol. 6 of the Hastings Law Journal at p. 213, it is stated: "This provision results in a much more efficient trial... The jury need not consider opinion evidence; the legislators have already done that for them. When the laboratory analyst testifies to the alcoholic content in the blood, the level of intoxication is automatically set and the burden of showing non-influence is placed upon the defendant." [12]

---

[9] *A Study of Chemical Tests for Alcoholic Intoxication,* 17 Md. L. Rev. 193 (1957).

[10] Brooks, *Chemical Tests for "Driving Under the Influence,"* 37 Mass. L. Q. 10, 13 (Dec. 1952).

[11] The most recent studies in relation to the amount of alcohol in the blood of the arrested person at the time of the alleged violation and the presumptions derived thereof, advise that the limits be enlarged as follows: .00% to .05%, the person is not under the influence of intoxicating liquor; .05% to .10%, possibly under the influence; .10% to .15%, is probably under such influence; and over .15% is definitely under the influence of such liquor. This alteration to the presumptions was necessary in the consideration of the tolerance factor in some individuals. National Safety Council, Evaluating Chemical Tests for Intoxication, p. 12.

[12] The preliminary research in these cases should generally cover a set of facts tending to reveal that the conduct of the defendant was due to the influence of intoxicating liquor. The State of Wisconsin follows the procedure described in the Wisconsin Law Review of 1958, pp. 200, 201:

*"Physical and Chemical Tests for Intoxication*

"In Wisconsin practically all the law enforcement agencies have adopted and put to use the standard tests for persons suspected of being under the influence of intoxicating liquor. This form is divided into three general segments, the first part containing the information identifying the defendant and various questions which are designed

■ The intervener relies on the fact that the legislative history [13] indicates that when the result of the chemical analysis is less than five hundredths of one per cent, by weight of alcohol, "it gives rise to the presumption that the defendant was not under the influence of intoxicating liquor, and if the law expressly prohibits that no other evidence may be produced to overcome this presumption, it is because such an amount of alcohol in the body while driving an automobile

---

to aid the prosecution in overcoming defenses at the time of trial. The defendant is asked whether or not he had been drinking, the amount, the quantity, the time he began drinking and the time he stopped, and the establishment in which he imbibed. He is then asked if he is ill, under a doctor's care, the name of the doctor, whether or not he is taking medicine, the type of medicine and the precise time he took the last dose. The purpose of this line of questioning is to rebut the possible defense at the trial that defendant was ill rather than under the influence of intoxicants, where the symptoms of the illness may be identical to those of a person who is under the influence of intoxicants. The defendant is then asked if he is diabetic, taking insulin, using a mouth wash, the date on which he last had been to a dentist, and the amount of sleep he had prior to his arrest. The purpose of these questions is the same as above, inasmuch as the symptoms of a person in diabetic or insulin shock are almost identical to those of an intoxicated person, even to what appears to be the odor of alcohol on the breath as the result of formation of ketones and acetones. The questions as to the amount of sleep are to rebut a possible defense that the officer mistook fatigue for intoxication.

"The defendant is then asked if he is hurt, if he received a bump on the head, and if he had anything to drink after being involved in the accident (if there was an accident). The first of these two questions is to overcome a defense that the actions of the defendant were the result of injuries, and the latter to obviate a defense that the defendant became intoxicated subsequent to his operating his automobile.

"The second segment of the standard alcohol influence tests consists of the arresting officer's visual observations of the defendant, including the defendant's breath, eyes, color of face, condition of his clothing, attitude, and any other unusual actions.

"The third segment consists of the physical tests which the defendant performs in the presence of the arresting officer. These tests include reaction of eyes to light, walking, balance, turning, the finger-to-nose test, picking up and identification of coins, speech, enunciation, defendant's knowledge of time and place, and handwriting sample of the defendant."

[13] Journal of Proceedings 2223–2225 (1960).

is not criminal." The intervener concludes that it is necessary to allege in the information that the result of the analysis was greater than five hundredths of one per cent, and that the absence of such an allegation makes the information fatally defective.

■ We do not share this view. In the first place, we have already set forth the purposes underlying these provisions respecting the results of the analysis, which are nothing more than probatory means for the efficient administration of the law in its phase of prosecuting crime. Hence, the law itself indicates that the result of the analysis "shall give rise to the following *presumptions*." In the second place, if such an allegation were necessary to render the information sufficient, we would find that in the cases where the driver refuses to have a sample taken, it could not be stated that the result of the analysis exceeded the per cent indicated. The crime of driving while intoxicated is one. We can not decide that in some cases the information should require the allegation of certain elements and in other cases it may dispense with the allegation of one of such elements. It is clearly inferred that this is a defense available to the defendant, *cf. People* v. *Vargas, supra; People* v. *Hiraldo*, 54 P.R.R. 608, 612 (1939); *People* v. *Avilés*, 54 P.R.R. 257 (1939); *People* v. *Giraud*, 52 P.R.R. 30 (1937), that is, if the result were less than five hundredths, this fact could be raised by way of defense [14] and it will be presumed conclusively—in view of the fact that paragraph (b) (4) of § 5–801 precludes the presentation of any other competent evidence—that the defendant was not under the influence of intoxicating liquor at the time of the alleged violation.

---

[14] Section 11 of the Regulation relating to Collection of Blood and Urine Samples, 9 R.&R.P.R. § 183–11, guarantees to the defendant knowledge of the result of the analysis previous to the trial since it provides that a copy of the report of the result shall be sent "to the subject... from whom the sample was taken, to his postal address."

■ Finally, in *People* v. *Cabrera, ante*, p. 94, we implicitly decided a question which is relevant to the one raised by the intervener. We rejected the allegation made by a defendant convicted of driving under the influence of intoxicating liquor directed towards challenging the procedure followed in the taking of the urine sample and its subsequent analysis, because "It having been established by the testimony of the policeman that the defendant was driving a vehicle while intoxicated, nothing new was added by the evidence of the chemical analysis of the urine to which he was submitted. (Citations.)" In other words, the district attorney may establish the crime without having to present evidence on the result of the test, and it would then be incumbent on the defendant to present the report of the analysis if it favors him by showing a percentage less than the five hundredths of the one to which we have previously referred.

The decision rendered by the Superior Court, San Juan Part, on May 31, 1961, is hereby set aside and the case remanded for further proceedings not inconsistent with this opinion.