[Civ. No. 12385. Fourth Dist., Div. Two. Apr. 13, 1973.]

RICHARD M. CARRINGTON, Petitioner, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Michael F. Flynn, Public Defender, and Stephen D. Cunnison, Deputy Public Defender, for Petitioner.

Byron C. Morton, District Attorney, John A. Adler and Jeffrey J. Prevost, Deputy District Attorneys, for Respondent and for Real Party in Interest.

## OPINION

**GARDNER, P. J.**—Petitioner was charged with vehicular manslaughter and felony drunk driving.

About 9:55 p.m. on May 13, 1972, California Highway Patrol Officer Davis arrived at the scene of an accident. The defendant had driven into

the rear of a school bus which contained 44 passengers. Eight were injured and one later died as a result of her injuries. The defendant was sitting in a pickup which was in contact with the rear of the bus. He was unconscious. He smelled of alcohol and a partially empty, cold can of beer was on the floorboard immediately in front of the seat. He was pinned in the cab and was in very serious physical condition. Officer Davis held the defendant's head until the fire department arrived so that his air passage was clear and he could breathe. It took about 25 minutes for the fire department to cut him out of the cab. He was then sent immediately to the nearest hospital; Officer Davis felt time was of the essence because of defendant's serious physical condition. The only hospital with jail facilities was 7 miles farther than the hospital to which he was taken.

Officer Davis arrived at the hospital about an hour and a half after he had first been called to the accident. In the meantime, he had remained at the scene. When Officer Davis arrived at the hospital, the defendant was still unconscious. Officer Davis arranged for a blood sample to be taken. He did not place the defendant under arrest. A citation was written a couple of days later. It is the practice of the California Highway Patrol to wait for the results of such a blood test before writing a citation. This practice is not for the purpose of determining whether an individual is under the influence but to determine the feasibility of a successful prosecution.

A duly qualified expert testified that the time factor is all important in the securing of a blood sample for a blood test. The closer it is taken to the time of the accident, the more accurate it is, whether this information be to the benefit of the People or to the accused. With the passage of time, a multitude of variables are introduced.

Defendant was actually arrested about six weeks after the accident on June 27, 1972.

A motion to suppress the results of the blood-alcohol test was made and denied. The present petition for writ of prohibition/mandate resulted.

 Assuming that "the means and procedures" employed are respectful of relevant Fourth Amendment standards of reasonableness, blood may be taken (1) pursuant to a search warrant, (2) with the consent of the defendant, or (3) as an incident to a lawful arrest. (*Schmerber* v. *California,* 384 U.S. 757, 771-772 [16 L.Ed.2d 908, 920, 86 S.Ct. 1826]; *People* v. *Duroncelay,* 48 Cal.2d 766, 771-772 [312 P.2d 690].) Prior to *People* v. *Superior Court* [*Hawkins*], 6 Cal.3d 757 [100 Cal.Rptr. 281, 493 P.2d 1145], there existed a formidable array of cases holding that blood could also be taken if there existed probable cause for an arrest

even though there had been no actual, formal arrest. However, this basis for the taking of blood was removed by *Hawkins* which disapproved the Court of Appeal cases which had placed the judicial stamp of approval on this practice. In *Hawkins,* the court said, "Similarly in *Duroncelay,* we made it perfectly clear that the seizure of the blood sample could only be justified as 'incident to the lawful arrest of one who is reasonably believed to have violated section 501 of the Vehicle Code.' (*People* v. *Duroncelay, supra,* 48 Cal.2d 766, 772.)" (6 Cal.3d at p. 762.) The court then disapproved the following cases insofar as inconsistent with its decision: *People* v. *Glass,* 266 Cal.App.2d 222 [71 Cal.Rptr. 858]; *McDonald* v. *Justice Court,* 249 Cal.App.2d 960 [58 Cal.Rptr. 29]; *People* v. *Bustos,* 247 Cal.App.2d 422 [55 Cal.Rptr. 603]; *People* v. *Huber,* 232 Cal.App.2d 663 [43 Cal.Rptr. 65]; and *People* v. *Pack,* 199 Cal.App.2d 857 [19 Cal. Rptr. 186].[1]

Thus since there was no search warrant, no consent and no arrest, it would appear at first blush that the blood sample in the instant case was obtained illegally.

However, *Hawkins* was decided on the lack of arrest theory only. It specifically noted that "The People have not even attempted to justify the taking of a blood sample from defendant under any of the 'few specifically established and well-delineated exceptions' to the 'basic constitutional rule in this area that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment" ' (citations), other than the 'incident to lawful arrest' exception discussed earlier in this opinion." (*People* v. *Superior Court* [*Hawkins*], *supra,* 6 Cal.3d at p. 765, fn. omitted.)

Thus, we proceed to a discussion of such an "established and well-delineated" exception, i.e., the emergency, necessity or "exigencies of the situation" rule as that rule may be used to excuse the lack of a formal arrest.[2]

---

[1]The perfect clarity of *Duroncelay* apparently became somewhat opaque when seen through the eyes of 12 justices of the Court of Appeal. In *Pack, Huber, Bustos* and *McDonald,* the Courts of Appeal cite *Duroncelay* as authority that blood could be taken if probable cause for the arrest existed even though no formal arrest had been made. In *Pack* and *McDonald,* petitions for hearings were denied.

[2]We take it as already well established by *Schmerber* that the "seizure" of a blood sample is reasonable on the basis of the exigent circumstances doctrine assuming a valid "seizure" of the person, i.e., a valid arrest. *Schmerber* excused the securing of a search warrant to obtain a blood sample largely because of the destruction of evidence by the passage of time.

In *United States* v. *Dionisio,* 410 U.S. 1, 8-9 [35 L.Ed.2d 67, 76, 93 S.Ct. 764, 769], the court said: "As the court made clear in *Schmerber, supra,* the obtaining of physical evidence from a person involves a potential Fourth Amendment

Courts have often recognized that the "exigencies of the situation" may justify a warrantless search which might have been unreasonable had emergency circumstances not existed. (*Warden* v. *Hayden* (1967) 387 U.S. 294, 298 [18 L.Ed.2d 782, 787, 87 S.Ct. 1642].) Generally, the emergency doctrine exists in situations in which there is a substantial threat to life, health or property. Under such circumstances, the officer is excused from ordinary Fourth Amendment restrictions because he is acting to save life or property. An often quoted authority in this field is *People* v. *Roberts*, 47 Cal.2d 374 [303 P.2d 721], which stated at page 377, "Necessity often justifies an action which would otherwise constitute a trespass, as where the act is prompted by the motive of preserving life or property and reasonably appears to the actor to be necessary for that purpose. (Citations.)"

Thus, compliance with normal Fourth Amendment protections and procedures has been excused when someone has taken an overdose of drugs and the police search for the container from which the drugs were taken for the purpose of diagnosis and treatment (*People* v. *Neth*, 5 Cal.App.3d 883 [86 Cal.Rptr. 12]); when the police are searching for identification of a badly wounded man (*People* v. *Gonzales*, 182 Cal.App.2d 276 [5 Cal.Rptr. 920]); when officers search the person of an unconscious individual experiencing convulsions in an attempt to identify him or discover the cause of the illness (*People* v. *Gomez*, 229 Cal.App.2d 781 [40 Cal. Rptr. 616]); when officers enter an apartment faced with the possibility that there may be an unexploded bomb therein (*People* v. *Superior Court* [*Peebles*], 6 Cal.App.3d 379 [85 Cal.Rptr. 803]); when the police hear a person moaning and enter a residence to determine if someone is in distress (*People* v. *Roberts, supra,* 47 Cal.2d 374); when the police have a good faith belief that a defendant has taken a drug overdose and is dying (*People* v. *Gallegos*, 13 Cal.App.3d 239 [91 Cal.Rptr. 517]); when the entry is to save a severely beaten child (*People* v. *Roman*, 256 Cal.App.2d 656 [64 Cal.Rptr. 268]); when the entry is to save a woman screaming for help (*People* v. *Clark*, 262 Cal.App.2d 471 [68 Cal.Rptr. 713]); when officers in hot pursuit of an armed and dangerous robber conduct a systematic search of the apartment complex into which he had fled (*People* v. *Bradford*, 28 Cal.App.3d 695 [104 Cal.Rptr. 852]). (See also *State* v. *Findlay*, 259 Iowa 733 [145 N.W.2d 650]; *State* v. *Deshner*, 158 Mont. 188 [489 P.2d 1290].)

---

violation at two different levels—the 'seizure' of the 'person' necessary to bring him into contact with government agents [citation] and the subsequent search for and seizure of the evidence. In *Schmerber,* we found the initial seizure of the accused justified as a lawful arrest, and the subsequent seizure of the blood sample from his body reasonable in light of the exigent circumstances."

*Schmerber* pointed out that where time had to be taken to take the accused to the hospital and to investigate the accident scene, there was simply no time to seek out a magistrate and secure a search warrant and the lack of a search warrant was excused by reason of these exigent circumstances.

A recent application of the "emergency of the situation" doctrine is to be found in *People* v. *Sirhan*, 7 Cal.3d 710, 737-739 [102 Cal.Rptr. 385, 497 P.2d 1121]. There, because of the possibility of a conspiracy to assassinate the nation's political leaders compliance with Fourth Amendment procedures was excused in the securing of evidence from the defendant's house without a search warrant. (See also *People* v. *Lanthier*, 5 Cal.3d 751 [97 Cal.Rptr. 297, 488 P.2d 625], in which the court found a "compelling urgency" by reason of a malodorous smell permeating a study hall which allowed authorities to open a locker and a briefcase without resort to judicial sanction.)

■ With these authorities in mind, we examine the actions of Officer Davis and his fellow officers during the time ensuing between their arrival at the scene of the accident and the time the blood sample was taken. We are aware that Officer Davis first struggled to save the defendant's life by holding his head so that his air passages were clear and he could breathe for the 10 minutes it took for the fire department to arrive. Then, when the defendant was finally extricated, the officer had the choice of allowing him to be taken to the nearest hospital because of his severe physical condition or directing the ambulance to send him some 7 miles farther to a hospital with jail facilities. In the time elapsing between the time of the officer's arrival at the scene of the accident and the time Officer Davis arrived for the blood sample to be taken, we may reasonably assume that Officer Davis and his fellow officers were busy. They were engaged in giving medical attention to the passengers in the school bus and obtaining for them ambulances for the purpose of sending them to the hospital. They were attempting to get the vehicles off the highway, putting up warning devices in an effort to save the lives of other motorists who might come upon the wreck at a high rate of speed, and directing traffic. They were also engaged in their duties of preserving the accident scene with photographs and drawings and securing the names and addresses of and taking statements from witnesses who might shed light upon the accident.

Officer Davis and his fellow officers were busy.

We then turn to the available grounds upon which Officer Davis could legally obtain the blood sample when he finally arrived at the hospital.

(1) A search warrant.

Assuming (a radical assumption indeed) that at that hour it was physically possible to secure a search warrant in time to make a blood test meaningful, the officer chose instead to engage in humanitarian duties which are hopefully more important on the judicial scale than the securing of a search

warrant. Realistically, we cannot expect Officer Davis to leave the defendant to choke on his own blood as he attempts to rout out a magistrate. *Schmerber* specifically excused the lack of a search warrant under these conditions. (See fn. 2.)

(2) Consent.

It needs no citation of authorities to state that an unconscious man is incapable of giving consent.

(3) Arrest.

The court in *Hawkins* made it "perfectly clear" that it did not consider the arrest "a mere formality" or a "ritualistic incantation of words." (*People v. Superior Court [Hawkins], supra,* 6 Cal.3d at pp. 762-763.)

Recognizing the binding authority of *Hawkins,* the officer in the instant case was faced with a perplexing problem.

In the first place, due to the fact that the defendant was unconscious, the officer was incapable of communicating to him the fact of arrest. (Pen. Code, § 841.)[3] Talking to an unconscious person has never been looked upon as productive of a meaningful exchange of ideas. Even were he to engage in this "ritualistic incantation of words," they would not be communicated to the defendant due to his unconscious state.[4]

Then also there was a problem of "actual restraint." (Pen. Code, § § 834, 835.) It is obvious that the defendant was seriously injured.[5] It would not have been humane for Officer Davis to peremptorily cart the defendant off to jail or even the jail ward of the county hospital some 7 miles away. At that point, the defendant's well-being and probably his life were at stake. For humanitarian reasons and because of the emergency situation which existed the defendant was not taken into custody.

Thus, pragmatically, there was no way to lawfully arrest the defendant. The rapid dissipation of alcohol in the blood does not, by itself, create an emergency situation sufficient to excuse an arrest. (*People v. Superior*

---

[3]Since the defendant was not actually engaged in the commission of the offense, nor was he escaping, or being pursued, the provisions of Penal Code section 841, were applicable.

[4]But see *People v. Lane,* 240 Cal.App.2d 634 [49 Cal.Rptr. 712], in which the officer "mentally" placed an unconscious person under arrest for violation of Vehicle Code section 23101, and thereafter secured a blood sample. This procedure, the court approved without any discussion of Penal Code section 841.

[5]At the time of the taking of the blood sample, the defendant had been unconscious for an hour and a half. He was arrested at the hospital over a month later and it may be reasonably inferred that the delay between accident and arrest was caused by his physical condition.

*Court* [*Hawkins*], *supra,* 6 Cal.3d 757, 765, fn. 7.) "Since the intoxicated person is of necessity present when the blood is seized, there are ordinarily no exigent circumstances to prevent his arrest." (*Ibid.*) Here, defendant's unconsciousness created such circumstances; he could not be lawfully arrested.

Because of his humanitarian activities, the officer had made it impossible to either secure a search warrant or to arrest the defendant. Because he was unconscious the defendant could not give consent. An emergency situation existed. Under the circumstances of this case, the lack of a formal arrest was excused on the emergency, necessity or "exigencies of the situation" doctrine.

*People* v. *Huber, supra,* 232 Cal.App.2d 663, is almost an identical case. In *Huber,* the defendant was unconscious, found behind the steering wheel of a car which had been driven on the wrong side of the street, he smelled of alcohol, was taken to a hospital and an hour later a blood sample taken. *Huber* held, relying primarily on the emergency or exceptional circumstances rule, that the taking of the blood sample was proper. *Huber* was one of the cases disapproved by *Hawkins.* However, the disapproval of *Huber* was not on the basis of its application of the emergency doctrine. Footnote 7 on page 765 of *Hawkins,* reads as follows: "The following cases have been brought to our attention [cases cited previously]. None of these cases, with the exception of *Huber,* were relied upon or even cited by the People. The People cited *Huber* to support their sole argument that probable cause to arrest justified a warrantless, unconsented to seizure of blood not incident to an arrest and not to support the theory proposed by the dissent.[6] To the extent that they are inconsistent with this opinion, the above cases are disapproved." Thus, as we read *Hawkins,* the basic holding of *Huber* on the emergency doctrine still remains valid even though *Huber* has been disapproved in another context.[7]

Petition denied.

Kerrigan, J., and Kaufman, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied June 27, 1973.

---

[6]Justice Burke in his concurring and dissenting opinion felt that the emergency doctrine would have excused the lack of arrest. However, he agreed that the theory had not been presented on the trial level and for that reason could not be presented for the first time on appeal. Here, the People have specifically relied on the emergency doctrine throughout the proceedings.

[7]*McDonald* v. *Justice Court, supra,* 249 Cal.App.2d 960, also relied on the emergency doctrine as an alternative justification for the search.