[Crim. No. 857.   Second Appellate District, Division Two.—May 20, 1922.]

## THE PEOPLE, Respondent, v. CHARLES W. ANDER-SON, Appellant.

[1] CRIMINAL LAW—MURDER—SELF-DEFENSE—INSUFFICIENCY OF EVI-DENCE. — In this prosecution for murder, wherein it was claimed that the killing was in self-defense, the details of the tragedy, as recounted by the people's witnesses, were such that the jury was fully warranted in its conclusion that the circumstances were not sufficient to excite the fears of a reasonable person, circumstanced as defendant, and that the defendant did not shoot the deceased under the influence of any fear of being killed or of suffering great bodily injury at the hands of the murdered man.

[2] ID.—EVIDENCE—FLIGHT FROM SCENE OF HOMICIDE.—In this prosecu-tion for murder, it was not error to permit the state to show all the circumstances attending the flight of the defendant from the scene of the homicide, including the shooting of a bystander, who jumped on the running-board of the defendant's automobile as the latter was about to drive away.

[3] ID.—FLIGHT—CIRCUMSTANCE OF GUILT.—While the flight of an ac-cused raises no presumption in law that he is guilty, it is admis-sible in evidence as a circumstance to be weighed by the jury as tending in some degree to prove consciousness of guilt, and is en-titled to more or less weight according to the circumstances of the particular case.

[4] ID.—EXPLANATION OF FLIGHT.—Where evidence of flight has been admitted, the accused may explain it and may show that it was

---

3.   Flight as creating presumption of guilt, note, 39 **L. R. A.** **(N. S.)** 58.

entirely consistent with innocence, and in a like manner the people may introduce evidence of the circumstances connected with the flight which will strengthen its probative value as tending to show the guilt of the accused.

[5] ID. — EVIDENCE — OTHER OFFENSES. — While evidence of offenses other than the one for which the defendant is on trial is not admissible, yet where the case is such that proof of one crime tends to prove any fact material in the trial of a person accused of another crime, such proof is admissible, and the fact that it may tend to prejudice the defendant in the minds of the jury is no ground for its exclusion.

[6] ID. — WILLFUL RESISTANCE TO ARREST — ADMISSIBILITY. — Willful resistance to arrest by a public officer who is authorized to make the arrest and who is discharging or attempting to discharge a duty of his office is a crime, but such resistance, if it be made by one who is placed on trial for the particular crime for which the officer sought to make the arrest, may be shown in evidence against the accused as tending to show his consciousness of guilt.

[7] ID. — REOPENING OF CASE — PROOF OF COURSE OF BULLET THROUGH EXHUMED BODY — DISCRETION. — In this prosecution for murder, it was not error to permit the state to reopen its case in chief and to introduce the testimony of the county autopsy surgeon as to the course taken by the bullet through body of the deceased, which had been exhumed after the commencement of the trial.

[8] ID. — SELF-DEFENSE — BURDEN OF PROOF — INSTRUCTION. — An instruction to the effect that it was the duty of the jurors to acquit unless they believed that the prosecution had proved defendant's guilt beyond a reasonable doubt "in the manner and form as charged" was tantamount to an instruction that the jury must acquit unless the prosecution, by proof satisfying the minds of the jurors beyond all reasonable doubt, should prove the killing to have been unlawful, that is, without justification, which was equivalent to saying that the prosecution must prove beyond a reasonable doubt that the defendant did not shoot in self-defense.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Frederick W. Houser, Judge. Affirmed.

The facts are stated in the opinion of the court.

5.   When evidence of other offenses is admissible, notes, 44 **Am. Rep.** 249; 105 **Am. St. Rep.** 976.

Fred H. Thompson for Appellant.

U. S. Webb, Attorney-General, and Arthur Keetch, Deputy Attorney-General, for Respondent.

FINLAYSON, P. J.—Defendant, who was charged with murder and convicted of manslaughter, appeals from the judgment and likewise from an order denying him a new trial.

The homicide consisted in the killing of one G. B. Armanda on July 17, 1921, shortly after midnight, at the Montebello oil fields in Los Angeles County, and after defendant, the deceased, and three other workmen had left their work upon a well which they were drilling for the Union Oil Company. The killing, which was done by shooting Armanda as the latter stood facing defendant, who was seated in his automobile, was admitted; but it was claimed that it was done in necessary self-defense.

As is usual in such cases, there was a sharp conflict in the evidence. The version of the tragedy and of the events leading up to it, as given by witnesses for the prosecution—whose testimony, in view of the verdict of conviction, must be deemed to have been accepted by the jury as true—is substantially as follows: Defendant was the foreman of a crew of oil drillers at work on an oil rig of the Union Oil Company near Montebello. He had under him a crew of about four men, one of whom was the decedent. Work on the well was done by crews working in shifts. Defendant and the four men under him had the night shift, working eight hours from 4 o'clock in the afternoon until 12 o'clock at night. On the evening of July 15, 1921, the men under defendant's charge were talking among themselves in a joking manner about matters pertaining to the marriage relation. In the course of the conversation the deceased jokingly said something which defendant interpreted as a reflection upon the legitimacy of his birth. Taking umbrage at the remark, defendant struck deceased a blow in the face while the latter was seated at a work-table. Though mutual explanations followed and defendant apologized for his hasty act, it is evident that the event left feelings of resentment rankling in the breast of each. The next day the deceased, whose fellow-workmen

had nicknamed him the "Wop," told defendant not to call him "Wop" any more, but to address him by his given name. Later in the evening defendant, apparently speaking to himself, was heard to say: "I see where I am going to kill me a Wop to-night." At midnight of that day, July 16, 1921, defendant, the deceased, and the three other men who constituted the night shift ceased their work on the well and went into the "dog house," where they changed their clothes preparatory to leaving the oil rig and going to their respective homes in automobiles which were parked near by. After they had changed their clothes the five men went out the back door together, defendant, preceding the others, bidding them "good-night." About this time the deceased, who had come out of the "dog house" with the others, spoke up, saying to defendant: "You are going to kill you a Wop to-night? I guess I am the Wop. Now, if you want to have this out, fight it out like a man." Still addressing defendant, who now had his hand on his hip pocket, the deceased said: "If you want to fight it out like a man, take your hand off that knife and we will fight it out like a man—settle the argument." Defendant made no reply, but, still keeping his hand on his hip pocket, walked backward up the slope of a hill toward where his automobile was parked, followed, for a short distance, by the deceased. Defendant continued to back up the hill until he found that he was not going in the right direction, when he turned and walked to his car, stepped into it and seated himself at the steering wheel. Decedent stopped and stood still while defendant thus walked to his car. Meanwhile, one V. E. Gardner, a fellow-workman in whose automobile the deceased had intended returning to his home, started the motor of his car. As Gardner started his engine, the deceased turned and walked toward Gardner's car, which, while being driven down the hill toward Montebello, was slowed down so as to permit the decedent to get in. In the meantime defendant, who had started his car, stopped it directly in front of and across the path of Gardner's car, blocking the latter's passage and causing him to come to a stop about five feet from defendant's car. As Gardner's car thus came to a stop, the deceased, with his foot on the running-board of Gardner's car, put his lunch-pail in his friend's machine, and was standing on the run-

ning-board preparatory to stepping into the car, when de-
fendant, from his car four or five feet away, called out to
the deceased, saying: "You are a son-of-a-bitch; you are a
God damned son-of-a-bitch." He repeated this three or
four times. Deceased replied in kind, saying: "You are
not a son-of-a-bitch; your mother was a cow." The de-
ceased then took his foot from the running-board of Gard-
ner's car and started toward defendant, who was still sit-
ting in his car. Standing some four or five feet from
defendant's car and shaking his finger at defendant, but
making no other hostile gesture or demonstration, the de-
ceased, addressing defendant, said: "Now, look here; we
have got to be at work to-morrow, and we have got to work
together; God damn it, we are going to get along, and I
just want you to understand that." The deceased repeated
this statement several times. Defendant said something in
reply, when the deceased, stooping down, picked up a clod
of dirt and said to defendant: "Don't you pull that knife
on me or I will crown you"; or, "If you draw a knife I
will brain you." According to the witnesses for the prose-
cution the deceased, though he told defendant that he would
"crown" him *if* the latter "pulled" his knife, made no
threatening gesture when he spoke; he did not lift his arm
as though to strike defendant or to hit him with the clod of
dirt that he had picked up, but kept both hands at his
side. As the deceased thus stood four or five feet from
where defendant was seated in his car, and while telling
defendant not to "pull" a knife on him or he, the deceased,
would "crown" him, there came a flash from defendant's
pistol and Armanda fell, mortally wounded. Gardner im-
mediately sprang from his car and started to Armanda's
assistance, but noticing a spot of blood on the latter's shirt
just over the heart, he jumped on the running-board of
defendant's car and tried to stop defendant, who, starting
his car forward immediately after shooting Armanda, was
leaving the scene of the tragedy. As Gardner jumped on
the running-board of defendant's car, he said to the latter:
"Anderson, you have killed him; you better stop." Gard-
ner had barely finished his admonition to defendant to stop
when another shot rang out and Gardner fell, shot through
the shoulder with a bullet from defendant's pistol. De-
fendant then drove away in his machine toward his home in

Montebello, where later he was arrested. The testimony respecting the shooting of Gardner went in over defendant's objection that it was not a part of the *res gestae,* and was incompetent and irrelevant.

Appellant contends: (1) That the verdict is contrary to law and the evidence; (2) that the court erred in permitting the prosecution to introduce evidence of the shooting of Gardner; (3) that the court erred in permitting the prosecution to reopen its case and introduce certain testimony as to the course taken by the bullet through Armanda's body, which was exhumed after the introduction of the people's case in chief; and (4) that the court erred in refusing certain instructions requested by defendant.

[1] There is no merit in the claim that the verdict is against law and the evidence. Because he was seated in his automobile when he fired the fatal shot, appellant says that he had all the rights of a person in his castle, and that he was under no obligation to retreat but could stand his ground and repel force with force. Without doubt, appellant had the right to stand his ground and to kill Armanda if, to a reasonable person, circumstanced as defendant was, that seemed necessary in order to save his own life or to save him from great bodily harm. But it was never claimed by the prosecution that appellant should retreat. Nor was it ever claimed that he would not be justified in shooting Armanda from where he sat in his car if the circumstances, as they appeared to him, were sufficient to excite the fear of a reasonable person that the deceased meant to kill him or to do him great bodily harm, and if he acted under the influence of such fear alone. What the prosecution contended was that the circumstances confronting appellant were not such as to excite the apprehension of a reasonable person. According to the witnesses for the prosecution, the deceased did not threaten to injure appellant at the time when the latter fired the fatal shot. The details of the tragedy, as recounted by the people's witnesses, were such that the jury was fully warranted in its conclusion that the circumstances were not sufficient to excite the fears of a reasonable person, circumstanced as defendant was, and that appellant did not shoot Armanda under the influence of any fear of being killed or of suffering great bodily injury at the hands of Armanda. It is

true, deceased had picked up a clod of dirt, but he held it at his side, saying no more to appellant than that he would "crown" him *if* he drew a knife, or words to that effect. The fact that the deceased had a clod of dirt in his hand, which he held at his side and threatened to use only in the event that appellant should draw a knife, did not necessarily justify appellant in taking Armanda's life in defense of his own. A simple assault does not justify homicide. (*People* v. *Webster*, 13 Cal. App. 349 [109 Pac. 637].) Whether the killing was done in self-defense was a question for the jury, who, from appellant's remark that he would "kill me a Wop to-night," might well have inferred that he shot Armanda with a predetermined design to kill, and that he but bided his time until decedent's hostile feelings might create the semblance of a necessity for taking life. All the circumstances and their full significance were for the jurors to determine and weigh; and their verdict, having substantial evidence to support it, cannot be disturbed unless it be vitiated by some erroneous ruling of the court.

[2] The court did not err in permitting the prosecution to show all the circumstances attending the flight of appellant from the scene of the homicide, including the shooting of Gardner, who, it will be recalled, jumped on the running-board of appellant's car as the latter was about to drive away from the scene and said to him, "Anderson, you have killed him; you better stop." [3] While the flight of an accused raises no presumption in law that he is guilty, it is admissible in evidence as a circumstance to be weighed by the jury as tending in some degree to prove consciousness of guilt, and is entitled to more or less weight according to the circumstances of the particular case. Evidence of flight is received, "not as a part of the *res gestae* of the criminal act itself, but as indicative of a guilty mind." (Roscoe on Criminal Evidence, 18. See, also, *People* v. *Giancoli*, 74 Cal. 644 [16 Pac. 510].) [4] For the same purpose the events and circumstances connected with the flight of the accused are equally admissible as a part of the *res gestae* of the flight. The accused may explain his flight and may show that it was entirely consistent with his innocence; and in a like manner the people may introduce evidence of the circumstances connected with the flight

which will strengthen its probative value as tending to show the guilt of the accused. (*Ford* v. *State,* 129 Ala. 16 [30 South. 27]; *Johnson* v. *State,* 120 Ga. 135 [47 S. E. 510].) One conscious of his innocence is less liable to use a lethal weapon to avoid detention or to facilitate his escape from the scene of a tragedy than is one who fears the consequences of his guilty act. **[5]** It is, of course, the general rule that evidence of offenses other than the one for which the defendant is on trial is not admissible. But where the case is such that proof of one crime tends to prove any fact material in the trial of a person accused of another crime, such proof is admissible, and the fact that it may tend to prejudice the defendant in the minds of the jury is no ground for its exclusion. Appellant's conduct, when he was informed by Gardner that he had killed Armanda and was counseled to stop, was a circumstance proper to be brought to the knowledge of the jury, not for the purpose of showing that defendant was guilty of the additional crime of assault with intent to commit murder, but for the purpose of determining whether such conduct was or was not an indication of guilt of the crime charged; and it matters not that the evidence tended to show that the defendant was guilty of another and distinct offense. **[6]** Willful resistance to arrest by a public officer who is authorized to make the arrest and who is discharging or attempting to discharge a duty of his office is a crime (Pen. Code, sec. 148); and yet such resistance, if it be made by one who is placed on trial for the particular crime for which the officer sought to make the arrest, may be shown in evidence against the accused as tending to show his consciousness of guilt. (*State* v. *Lambert,* 104 Me. 394 [15 Ann. Cas. 1055, 71 Atl. 1092]; 16 C. J., p. 553.)

**[7]** It was not error to permit the prosecution to reopen its case in chief and to introduce the testimony of the county autopsy surgeon and others as to the course taken by the bullet through the body of the deceased, which had been exhumed after the commencement of the trial. It was within the discretion of the court to allow the district attorney to reopen the case for further testimony. And since no abuse of discretion appears, there was no error. In granting the prosecution leave to reopen its case the trial judge expressly stated that, in the interest of justice,

defendant would be given the opportunity to make such measurements on the exhumed body as he might desire. Appellant's counsel saw fit to decline this offer, and he cannot now be heard to say that his case was prejudiced by the court's action.

Complaint is made that the court erred in refusing to give certain instructions proposed by defendant bearing upon the question of self-defense. The law upon that subject was fully and fairly presented to the jury by the instructions which were given. All the necessary, fundamental, and essential legal propositions relating to the situation were clearly and fully presented in the court's instructions, including the nature of the charge against defendant, the definition of the various offenses contained therein, the necessity of the prosecution proving beyond all reasonable doubt every material element of any crime contained within the information before the jury would be warranted in finding a verdict of guilty, the presumption of innocence attending the defendant at all stages of the case, the right of the jury to determine the credibility of the witnesses and the weight of evidence, the definition of reasonable doubt, the right of self-defense, including the doctrine of appearances—in fact, everything which the situation seemed to demand. The instructions upon the law of self-defense which were requested by defendant and refused by the court, if given, could not have thrown any more light upon that question than was furnished by the instructions allowed and read to the jury. Their rejection, therefore, was not error.

[8] It seems to be appellant's contention that the court should have instructed the jury, in so many words, that the burden of proof was upon the prosecution to show that defendant did not kill Armanda in self-defense. Appellant cannot claim that the instructions given by the court placed upon him the burden of proving justification by showing a case of self-defense. Nowhere in its charge did the court say anything which, by any stretch of the imagination, might be construed as an intimation that the burden was upon defendant to justify the homicide by showing self-defense. On the contrary, the jury was instructed, in effect, that the burden was upon the prosecution to show that the killing was not done in self-defense. In its charge to the

jurors the court specifically instructed them that it was their duty to acquit the defendant unless the prosecution proved his guilt "beyond a reasonable doubt . . . . *in the manner and form as charged.*" The information charged that defendant did "unlawfully" kill one G. B. Armanda. Murder is the "unlawful" killing of a human being. (Pen. Code, sec. 187.) So, also, is manslaughter the "unlawful" killing of a human being. (Pen. Code, sec. 192.) If one kills in self-defense the killing is not "unlawful." From this it follows that the instruction to the effect that it was the duty of the jurors to acquit unless they believed that the prosecution had proved defendant's guilt beyond a reasonable doubt, "in the manner and form as charged," is tantamount to an instruction that the jury must acquit unless the prosecution, by proof satisfying the minds of the jurors beyond all reasonable doubt, shall prove the killing to have been "unlawful," that is, without justification, which is equivalent to saying that the prosecution must prove beyond a reasonable doubt that the defendant did not shoot in self-defense.

Defendant requested an instruction to the effect that where one is killed in a deadly encounter and the survivor claims that the killing was in self-defense, the question as to who was the aggressor is of vital importance, and all acts of hostility or threats "communicated or *uncommunicated*" are proper to be considered by the jury. In refusing to give this instruction the court did not err. While it is true that there is some evidence to the effect that prior to the day of the homicide the deceased had complained to his fellow-workers of defendant's domineering conduct and spoke of him in disrespectful terms, there is no evidence that he ever made any threat to kill defendant or to do him bodily harm. For this reason we need not discuss the question whether the requested instruction involved a strictly accurate abstract statement of the law, for it is clear that it is not applicable to the evidence and doubtless for that reason was rejected by the court.

The judgment and the order denying a new trial are affirmed.

Works, J., and Craig, J., concurred.