[Crim. No. 7725. Second Dist., Div. Two. Feb. 5, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. FRED W. PACK, Defendant and Appellant.

Edward L. Lacy for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Herbert Davis, Deputy Attorney General, for Plaintiff and Respondent.

FOX, P. J.—Defendant was convicted by a jury of violating section 23101 of the Vehicle Code in that he drove an automobile while under the influence of intoxicating liquor, proximately causing bodily injury thereby. His motion for a new trial was denied. Probation was granted for a three-year period, one of the conditions being the payment of a fine of $250. Defendant has appealed from the judgment (order granting probation[1]) and from the order denying his motion for a new trial.

On the evening of August 1, 1960, Ronald L. Hudelson was involved in an automobile accident while driving in a westerly direction on Highway 118, a road connecting Simi and San Fernando Valleys by way of Santa Susana Pass. His cousin, Charlette Olinger, was in the car with him at the time. He remembers driving his Oldsmobile at a speed of approximately 30 to 35 miles per hour on the right side of the highway when all of a sudden a Lincoln came at him on the wrong side of the road and a collision ensued. The collision occurred at a point in Los Angeles County about 500 feet east of the Ventura-Los Angeles County line. It took place on the outside of a curve in the highway. Hudelson blacked out. He and his cousin were hospitalized at Woodland Park Community Hospital. He remained there for five days.

---

[1] See Penal Code section 1237, subdivision 1.

Defendant was traveling eastbound with two male companions in his Lincoln car. He was rendered unconscious and did not regain consciousness until the following morning in the Woodland Park Community Hospital. The accident apparently happened about 9:25 p. m.

Officer Carlson of the California Highway Patrol went to the scene of the accident in response to a call at approximately 10 o'clock that evening. He observed that the accident was between an Oldsmobile and a Lincoln and that both cars were severely damaged. The accident occurred on a two-lane highway, each lane being approximately 15 feet wide. He noticed that the major portion of the damage was to the left front of the Lincoln and the left front of the Oldsmobile. There were no people in either car when the officer arrived. He was unable to obtain the names of any witnesses who saw the accident. In the course of his investigation Officer Carlson found a partially filled quart bottle of beer on the front floor of the Lincoln. He was given some photographs of the accident, taken by a photographer, depicting the cars in a state of collision on the outside of the curve. The photographer arrived shortly before 10 p. m. He took the pictures at approximately 10:10. They truly and accurately depicted the scene.

Officer John R. Ellis, also of the California Highway Patrol, was at the scene of the accident with Officer Carlson. Officer Ellis had had extensive experience in investigating accidents. He observed debris lying under the fenders of the Lincoln. He concluded that this was the point where the Lincoln came to rest. He also observed a gouge in the pavement. He established the point of impact of the "collision as approximately six feet from the edge—south from the north edge of the roadway . . ." approximately where the gouge marks were. There is no evidence that the cars had been moved from the other side of the road.

Officer Ellis went to the Woodland Park Community Hospital to see defendant. He found him in a room with three other patients. In his opinion defendant was unconscious. Gerald Sprague, who was a medical student, was employed as a laboratory technician at the hospital. He was instructed by a hospital physician to take a blood sample from defendant for medical reasons. The physician went with him into the room to be sure he had the right patient. Later that evening the witness took another blood sample from the defendant for the Highway Patrol. Officer Ellis was present when Sprague withdrew blood from the defendant's left arm, using a steril-

izing agent and syringe. The blood was put into a vial supplied by Officer Ellis, and the vial was then sealed. Sprague placed his initials on the container. Ellis locked the vial in a refrigerated unit in his office in West Los Angeles. Officer Ellis identified People's Exhibit 5 by his writing and ID number as being the vial in which he put the blood taken from defendant and the manila envelope in which he put the vial which he locked in the refrigerated unit in his office. Sprague's initials were also on the vial. (Exhibit No. 5.)

George Stevens, traffic officer of the Highway Patrol, took the manila envelope (People's Exhibit No. 5) from the locked refrigerated compartment in the office in West Los Angeles and brought it to the sheriff's crime laboratory on August 2, giving it to the deputy on duty at the time.

Harry E. McKeehan, an expert forensic chemist with the Los Angeles County Sheriff's Crime Laboratory, removed the manila envelope (People's Exhibit No. 5) from his laboratory later that day. It contained a sealed vial in which was some fluid resembling blood. Chemical analysis of this fluid was made by the witness for the purpose of determining how much, if any, alcohol was present therein. His analysis disclosed that there were .16 grams of alcohol per 100 cubic centimeters of blood, or .16 per cent by weight. The system used is reliable to 1/10th of a milligram. The witness identified the vial marked People's Exhibit 5 as being the vial containing the fluid he analyzed.

Tom Wieland, an expert forensic chemist, testified that on the basis of numerous experiments that he had conducted a person who had a level of .15 per cent by weight would be under the influence of alcohol. He further stated that the rate at which the blood alcohol level goes down varies from person to person and that in his experience the lowest rate is .01 per cent of alcohol by weight per hour; that the average rate is about .02 per cent.

Defendant testified that he had driven the Santa Susana road many times; that it is a straight road from the Los Angeles County Line for about 500 feet and then it veers sharply to the left where there is a blind left curve. There is a down grade slope in the road going east which you cannot see as you approach it. However, once you get around that curve you can see for 1,000 feet or more.

Defendant further testified that on August 1, 1960, he was driving in an easterly direction on this road with two other men in his car. He was traveling on the right hand side of the

road at about 30 miles an hour when he started into the curve; he did not know what happened; he saw a flash of light from another automobile and from then on he remembered nothing. The accident occurred on his side of the road.

Defendant woke up the following morning in the Woodland Park Community Hospital. He did not recall any events between the accident and the time he woke up that morning. No one made a request that he give a sample of blood. He did not observe any marks on his arm the next morning. He was not placed under arrest and never saw Officers Carlson or Ellis, or Mr. Sprague.

Defendant's first contention is that the court erred in admitting in evidence People's Exhibit 7, which is a freehand drawing made by Officer Carlson while he was on the witness stand to illustrate the scene of the accident. His contention is that this drawing depicts the curve as turning in the opposite direction from that in which it does in fact turn. Defendant concedes that "the trial court specified that People's Exhibit 7 was admitted only for purposes of illustration." To admit such illustrative drawing is properly within the court's discretion. (*Silvey* v. *Harm,* 120 Cal.App. 561, 571 [8 P.2d 570]; 18 Cal.Jur.2d, Evidence, § 224.) It is nevertheless contended that it was prejudicial because it materially confused the truth and in effect created a false image in the minds of the jurors. We fail to find any merit in this argument.

Both sides agree upon three things: (1) that the defendant was driving easterly; (2) that Hudelson was traveling westerly; and (3) that the collision occurred on the outside of the curve. People's Exhibits 2 and 3, which are photographs of the cars shortly after the accident and which were taken by the photographer; the diagram on the traffic accident report; Officer Carlson's testimony illustrated by People's Exhibit 7;[2] and Officer Ellis' testimony that the point of impact was "approximately six feet from the edge—south from the north edge of the highway . . .," are all consistent as to the manner in which the accident happened and demonstrate that it occurred on the north side of the highway, thus substantiating Hudelson's testimony that his car was on its proper side of

[2] It is interesting to note that when People's Exhibit 7 was offered in evidence counsel for defendant made no suggestion that it did not fairly portray the scene of the accident. His only comment was that the jury should be admonished that it was not drawn to scale. The court did so admonish the jury.

the highway and that defendant's Lincoln had passed over the center line onto the wrong side.

Defendant's exhibits are photographs which were taken after the cars were removed from the highway. He claims these photographs represent the curve in question. He testified as to the points from which these photographs were taken and the direction in which the photographer was facing. If the defendant's testimony as to these photographs were accepted as being correct, it would follow that the accident occurred on the south side of the highway rather than on the north side, and that his automobile was therefore on its proper side of the highway. The exhibits and the testimony relative to the foundation for them merely presented a conflict in the evidence which the jury was called upon to resolve. In making this resolution the jury was not required to give credence to the defendant's testimony in these respects. They were entitled to take into account his interest in the outcome of this litigation. (*Huth* v. *Katz,* 30 Cal.2d 605, 609 [184 P.2d 521]; *Kraut* v. *Cornell,* 175 Cal.App.2d 528, 532 [346 P.2d 438].) The jury's resolution of this question against the defendant, being based on substantial evidence, is controlling on appeal.

Defendant contends the court erred in admitting in evidence plaintiff's Exhibit 5. The first aspect of this contention is that there is no evidence to show how the vial containing a sample of defendant's blood got into the refrigerator of the sheriff's crime laboratory. Officer Ellis testified he took the sealed vial from the hospital and put it into a manila envelope which he locked in the refrigerated unit in his West Los Angeles office; Officer Stevens on August 2d delivered this package to the deputy in charge at the crime laboratory; McKeehan, the department's forensic chemist, removed the manila envelope from the crime laboratory and tested the fluid in the sealed vial. Bearing in mind the presumption that "official duty has been regularly performed" (Code Civ. Proc., § 1963, subd. 15) it is a reasonable inference that the deputy on duty at the crime laboratory to whom Officer Stevens delivered the manila envelope either placed it in the refrigerator or that it was placed there pursuant to his direction. This presumption is itself evidence. (*Raymond* v. *Independent Growers, Inc.,* 133 Cal.App.2d 154, 162 [284 P.2d 57].) No fact has been suggested to rebut this evidence. It is therefore clear that the chain of possession of People's Exhibit 5 has been sufficiently established.

The second aspect of defendant's contention is that People's Exhibit 5 was obtained and admitted in violation of his constitutional rights. Pertinent to defendant's position is the statement of the court in *People* v. *Duroncelay,* 48 Cal. 2d 766, 770-771 [312 P.2d 690] : "It is settled by our decision in *People* v. *Haeussler,* 41 Cal.2d 252, 257 [260 P.2d 8], that the admission of the evidence did not violate defendant's privilege against self-incrimination because the privilege relates only to testimonial compulsion and not to real evidence. We also held in the *Haeussler* case that the taking of the defendant's blood for an alcohol test in a medically approved manner did not constitute brutality or shock the conscience and that, therefore, the defendant had not been denied due process of law under the rule applied in *Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396]. This holding is in accord with the recent decision of the United States Supreme Court in *Breithaupt* v. *Abram,* 352 U.S. 432 [77 S.Ct. 408, 1 L.Ed.2d 448], where blood for an alcohol test was taken by a doctor while the defendant was unconscious. The court pointed out that blood tests had become routine in everyday life and concluded that 'a blood test taken by a skilled technician is not such "conduct that shocks the conscience," *Rochin, supra* (342 U.S. at 172), nor such a method of obtaining evidence that it offends a "sense of justice," *Brown* v. *Mississippi,* 297 U.S. 278, 285, 286 [56 S.Ct. 461, 80 L.Ed. 682].' There is no claim in the present case that the blood sample was not withdrawn in a medically approved manner. The blood was extracted by a registered nurse, and her testimony shows that she sterilized defendant's arm and used sterilized instruments.

"The question remains as to whether the taking of defendant's blood constituted an unreasonable search and seizure in violation of his constitutional rights." The court went on to answer this question in the negative. At page 772 it was stated: "The incidence of death and serious injury on the highways has undeniably assumed tragic dimensions and has been due in a significant degree to the effects of alcohol upon drivers. (See National Safety Council Accident Facts—1955, pp. 43-71.) So long as the measures adopted do not amount to a substantial invasion of individual rights, society must not be prevented from seeking to combat this hazard to the safety of the public. The extraction of blood for testing purposes is, of course, an experience which, every day, many undergo without hardship or ill effects. When this fact, to-

gether with the scientific reliability of blood alcohol tests in establishing guilt or innocence, is considered in the light of the imperative public interest involved, the taking of a sample for such a test without consent cannot be regarded as an unreasonable search and seizure where, as here, the extraction is made in a medically approved manner and is incident to the lawful arrest of one who is reasonably believed to have violated section 501 [now 23101] of the Vehicle Code.''

Defendant attempts to distinguish this case by reference to the fact that the blood was taken ''incident to a lawful arrest'' (although the arrest followed the taking of the sample), while here there was no arrest at all. The distinction is not sound. Our courts have repeatedly stated that: ''A search or seizure may be justified even though it is in no way related to an arrest.'' (*People* v. *Ball,* 162 Cal.App.2d 465, 467 [328 P.2d 276]; *People* v. *Murphy,* 173 Cal.App.2d 367, 379 [343 P.2d 273]; *People* v. *Shafer,* 183 Cal.App.2d 127, 130 [6 Cal. Rptr. 594].) ''The real criterion as to the reasonableness of a search is whether or not . . . under the facts, the police officer has reasonable grounds to believe that defendant may have committed a felony.'' (*People* v. *Soto,* 144 Cal.App. 2d 294, 298 [301 P.2d 45]; *People* v. *Anders,* 167 Cal.App.2d 65, 67 [333 P.2d 854]; *People* v. *Brajevich,* 174 Cal.App.2d 438, 444 [344 P.2d 815].)

Here Officers Carlson and Ellis arrived at the scene of a collision between a Lincoln and an Oldsmobile on the evening of August 1, 1960. The Lincoln was on the wrong side of the highway; there were no skid marks. The officers found a partially filled quart bottle of beer on the front floor of the Lincoln. They checked with the Ventura police and learned that persons had been injured in the accident and taken to the Woodland Park Community Hospital. Investigation revealed that the Lincoln was registered in the name of defendant. Officer Ellis had previous experience in investigating automobile accidents. The position of the two cars indicated that the Lincoln was traveling east and the Oldsmobile in a westerly direction. He found marks on the highway and debris indicating the point of impact of the two cars. From this factual picture the officers had reasonable grounds to believe that the driver of the Lincoln went to the wrong side of the highway thereby causing the collision, and that the driver was under the influence of alcohol at the time. Therefore there was probable cause to believe that a felony had been committed. Hence the obtaining of a blood sample from

defendant was not an unlawful search. Therefore the sample (Exhibit 5) together with its analysis was properly admitted in evidence.

It was important to get the sample as soon as possible in order that the analysis might the more accurately reflect the alcoholic content since such content became lower with the passage of time. It should also be pointed out that such tests are generally regarded as highly reliable and of substantial assistance in determining the issue of intoxication, and that a test of this kind may serve to exonerate as well as to convict.

Defendant also argues that the court should have (1) instructed the jury to acquit him and (2) granted him a new trial. These arguments are predicated on the hypothesis that neither Exhibit 5 nor Exhibit 7 was admissible in evidence. In that event, he argues, there would have been no evidence to support the conviction. We have concluded, however, that defendant's position with respect to each of these matters is not well taken. In this state of the record we need not again review the evidence to pass upon the court's ruling. Suffice it to say that both rulings appear to be entirely correct.

Affirmed.

Ashburn, J., and Herndon, J., concurred.

A petition for a rehearing was denied March 2, 1962, and appellant's petition for a hearing by the Supreme Court was denied April 3, 1962. Schauer, J., and Peters, J., were of the opinion that the petition should be granted.