[Crim. No. 5054. First Dist., Div. One. Jan. 28, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. ARTHUR ZAVALA, Defendant and Appellant.

Frank A. Kasama, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Derald E. Granberg and Horace Wheatley, Deputy Attorneys General, for Plaintiff and Respondent.

MOLINARI, J.—Defendant Arthur Zavala appeals from the judgment of conviction after he and his codefendant Ruth Ann Jennings were found guilty by the jury of a violation of Health and Safety Code sections 11500.5 and 11530 (possession of heroin for sale and possession of marijuana, respectively).

Appellant's contentions on appeal are threefold: That the trial court erred in allowing testimony and comment on his refusal to take a Nalline test "when the accused was not advised [of] his constitutional right to refuse and to remain absolutely silent"; that "remote and highly prejudicial circumstantial testimony was admitted into evidence improperly"; and that "this case was being tried on the theory that

the holding of the *Dorado* case was no longer law." Although appellant does not complain that the evidence is insufficient to sustain his conviction, it is necessary to recount it in substance so that the matters complained of can be viewed in proper perspective. This is particularly true insofar as appellant raises the issue of the applicability of *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], to the instant case.

On the evening of July 17, 1964 Sergeant Edward Hilliard of the Oakland Police Department, along with other members of the narcotics detail of the Oakland Police Department and several agents from the State Bureau of Narcotic Enforcement, went to the apartment house at 29 Moss Avenue, at which appellant and Miss Jennings were living. Hilliard had in his possession a search warrant bearing defendants' names and instructing Hilliard to search their apartment at this address. Upon obtaining a key from the landlady, Hilliard and the other officers entered apartment No. 1 in which defendants were living. Upon entering the apartment, Hilliard walked into the bedroom where he found defendants standing next to a dresser. Hilliard observed that appellant had a small knife in his hands and was making a chopping motion up and down over what appeared to be some items encased in a piece of kleenex on the top of the dresser. When Hilliard announced himself and his companions as police officers and stated that they had a search warrant to search the premises, appellant "scooped up" the kleenex from the dresser and ran into the kitchen. Several of the other officers followed appellant into the kitchen and after a brief struggle appellant was subdued and handcuffed. On the kitchen floor Hilliard found a kleenex containing a prophylactic rubber filled with a substance which later proved to be heroin and a coin purse containing two eye-droppers, a copper wire, and a hypodermic needle. In addition, from the kitchen floor and the stove top, respectively, Hilliard recovered a brown crystal-like substance which was found to contain heroin and a second prophylactic rubber partially filled with heroin. Hilliard's search of the apartment and of appellant also produced the following items which were introduced into evidence at the trial: a paper packet containing a substance identified as methedrine, which was found in appellant's pocket; a powdery substance containing heroin, two teaspoons, several writing tablets, a square white pad and some rubber bands, which were found on the top of the bedroom dresser; a band-aid can containing two marijuana cigarettes, which was found in the bedroom closet; and a can of milk sugar, which

was found in a hall closet. In addition, appellant's trousers were introduced into evidence along with the brownish powdery substance which Hilliard had noticed on the front of them and which was subsequently identified as heroin.

In addition to the foregoing, the record discloses that Hilliard testified that upon taking appellant to the Hall of Justice after his arrest Hilliard observed what appeared to be fresh scars or puncture marks over the veins on the inside of both of appellant's arms, but that appellant denied that these were from the injection of heroin. Testimony was also adduced from Dr. Burton W. Adams, who examined appellant at the Oakland Nalline Clinic on July 18, 1964, that appellant had needle marks on his right inner elbow, and that appellant refused to submit to a Nalline test. As a foundation for Dr. Adams' testimony, it was stipulated by counsel outside the presence of the jury that a Sergeant DuBois had interviewed appellant prior to Dr. Adams' examination and had asked appellant to submit to a Nalline test, and that appellant refused. In addition, it was stipulated that DuBois did not inform appellant of his right to counsel or his right to remain silent prior to requesting that appellant take the Nalline test.

Turning to appellant's first contention that it was error for the trial court to admit into evidence over his objection[1] the testimony of Dr. Adams concerning appellant's refusal to submit to a Nalline test, we note that the claim of error is essentially predicated upon the ground that such refusal was elicited in violation of his right to counsel and to remain silent and therefore evidence thereof was inadmissible. Additionally, however, appellant appears to contend that the admission of such evidence was violative of his privilege against self-incrimination.[2] Before proceeding to discuss these contentions we first deem it proper to consider the nature and purpose of the test in question and the authority for administering it.

Section 11723 of the Health and Safety Code[3] provides as follows: "In any case in which a person has been arrested for a criminal offense and is suspected of being a narcotic addict, a law enforcement officer having custody of such person may, with the written consent of such person, request the city or county health officer, or physician appointed by such health

---

[1]Appellant's attorney made a formal objection to this testimony both in open court and in chambers.

[2]The record discloses that an objection predicated upon this ground was made in the court below.

[3]Unless otherwise indicated, all statutory references hereinafter made are to the Health and Safety Code.

officer pursuant to Section 11722, to administer to the arrested person a test to determine, by means of use of a synthetic opiate antinarcotic in action, whether the arrested person is a narcotic addict, and such health officer or physician may administer such test to such arrested person.'' In section 11728 the legislative policy underlying the enactment of this statute[4] is stated in terms of statewide concern for the rehabilitation of narcotic addicts and the prevention of the continued addiction to narcotics. To this end it is the declared policy to encourage cities and counties to make use of ''synthetic opiate anti-narcotics in action'' to determine narcotic addiction or the absence thereof, and to foster research in the means of detecting narcotic addiction. (§ 11728.)

''A synthetic opiate anti-narcotic is a drug that has the effect of counteracting the physiologic actions of morphine, heroin and other morphine derivatives.'' (1961 Report to Legislature by Dept. of Justice on ''The Synthetic Opiate Anti-Narcotic Testing Program,'' p. 7.) The most widely used of such drugs is that referred to by the trade name ''Nalline.'' (Report, *supra*, p. 7; see 48 Cal.L.Rev. 282.) The use of Nalline to determine whether the person tested is a narcotic user is referred to as the Nalline test and consists of an injection of such drug under the skin and subsequent measurement of the pupils of the eyes, which, in the case of a narcotics user with opiates in his system, will dilate. (Report, *supra*, pp. 9-11; see *People* v. *Williams,* 164 Cal.App.2d Supp. 858, 860 [331 P.2d 251]; Witkin, Cal. Evidence (1963 Supp.) § 326A, p. 129; and see 48 Cal.L.Rev. 282-283.)

In discussing section 11722, which provides for the administering of the subject test to persons placed on probation or parole, *Williams* noted that the enactment of this statute ''must be accepted as a legislative mandate that the Nalline test has probative value.'' (P. 862.) It was accordingly held in *Williams,* where the defendants were charged with being under the influence of or addicted to the use of narcotics (§ 11721 as it then provided), that the results of such tests, voluntarily taken by the defendants, were admissible in evidence. In *People* v. *Hightower,* 189 Cal.App.2d 309 [11 Cal. Rptr. 198], a case involving a prosecution for illegal possession of narcotics, the results of the Nalline test given with the defendant's oral and written consent were held admissible in

---

[4]Provisions similar to those of section 11723 are contained in section 11722 providing for the imposition of the subject test as a condition of probation or parole of a narcotic user.

evidence. Similarly, in *People* v. *Davis*,[5] 231 Cal.App.2d 180 [41 Cal.Rptr. 617], where the Nalline test was given to the defendant several hours after his arrest, the appellate court, relying upon *Williams,* held that the results of the Nalline test were admissible in a prosecution for possession of heroin (§ 11500) for the purpose of showing the defendant's knowledge of the presence of the narcotic in a room he occupied with another person, and his knowledge that the substance was a narcotic. The opinion in *Davis* is silent as to whether consent was given for the test. It appears, however, that there the objection to the admission into evidence of the results of the test was not predicated upon the defendant's lack of consent but upon the ground of irrelevancy.

We are unaware of any reported case dealing with the question of the admissibility of the results of a Nalline test given without the defendant's consent. However, the receiving in evidence of the results of a blood test, a saliva test, and a breath analysis test given in a medically approved manner without the consent of the suspect or accused has been held not to violate the defendant's rights under the federal and State constitutions. (Blood tests: *Breithaupt* v. *Abram,* 352 U.S. 432 [77 S.Ct. 408, 1 L.Ed.2d 448]; *People* v. *Haeussler,* 41 Cal.2d 252, 257-260 [260 P.2d 8]; *People* v. *Duroncelay,* 48 Cal.2d 766, 770 [312 P.2d 690]; *People* v. *Kemp,* 55 Cal.2d 458, 478 [11 Cal.Rptr. 361, 359 P.2d 913]; *People* v. *Knox,* 178 Cal.App.2d 502, 513 [3 Cal.Rptr. 70]; *People* v. *Pack,* 199 Cal.App.2d 857, 863 [19 Cal.Rptr. 186]; *People* v. *Huber,* 232 Cal.App.2d 663, 670-672 [43 Cal.Rptr. 65]; saliva test: *People* v. *Kemp, supra,* p. 478; breath analysis test: *People* v. *Conterno,* 170 Cal.App.2d Supp. 817, 826-827 [339 P.2d 968].) Subjecting a defendant to such tests has been held not to be violative of the defendant's privilege against self-incrimination (see *People* v. *Haeussler, supra,* p. 257; *Vasquez* v. *Superior Court,* 199 Cal.App.2d 61, 64 [18 Cal.Rptr. 140]; *People* v. *Pack, supra,* p. 863; *People* v. *Huber, supra,* p. 672), because such privilege extends only to testimonial compulsion (*People* v. *Haeussler, supra,* p. 257; *People* v. *Trujillo,* 32 Cal. 2d 105, 112 [194 P.2d 681]; *People* v. *Duroncelay, supra,* p. 770; and see *People* v. *Lopez,* 60 Cal.2d 223, 244 [32 Cal.Rptr. 424, 384 P.2d 16]); nor violative of the constitutional provisions against unreasonable search (*People* v. *Duroncelay, supra,* pp. 771-772; *People* v. *Pack, supra,* pp. 863-864), as long as the tests are not administered in a fashion so as to

---

[5] A petition for a hearing by the Supreme Court was denied.

shock the conscience or offend one's sense of justice (*Rochin v. California*, 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396]; *People* v. *Kemp, supra,* p. 478; *Vasquez* v. *Superior Court, supra,* pp. 64-66; *People* v. *Pack, supra,* p. 863; *People* v. *Bass,* 214 Cal.App.2d 742, 746-747 [29 Cal. Rptr. 778]; *People* v. *Tahtinen,* 210 Cal.App.2d 755, 759-760 [26 Cal.Rptr. 864]). It has been held, moreover, that since the results of such tests may exonerate as well as convict (*People* v. *Duroncelay, supra,* p. 772; *In re Newbern,* 175 Cal.App.2d 862, 865 [1 Cal.Rptr. 80, 78 A.L.R.2d 901]; *People* v. *Knox, supra,* p. 513) an arrested person has the right to demand that he be permitted to take such test on his own behalf (*In re Newbern, supra,* pp. 864-866; *McCormick* v. *Municipal Court,* 195 Cal.App.2d 819, 821-824 [16 Cal.Rptr. 211]; *In re Howard,* 208 Cal.App.2d 709, 713-714 [25 Cal.Rptr. 590]). ▉ Upon the analogy of these cases, therefore, we conclude that a person has no constitutional right to refuse to take a Nalline test provided it is administered in a medically approved manner and not in a fashion that shocks the conscience or offends one's sense of justice.

Although we have concluded that a suspect or an accused may not refuse to take a Nalline test on constitutional grounds, provided it is administered in a manner which does not offend due process, he may refuse to take the test in California by reason of the enactment of section 11723, which requires written consent for the administration of the Nalline test. It should be noted, however, that section 11723 comes into play only where a person has been arrested for a criminal offense and is suspected of being a narcotic addict. Under such circumstances, section 11723 provides that a Nalline test can be administered to the arrested person with his written consent. Thus, it appears from the language of this statute that, except where the test is imposed as a condition of probation or the parole of a narcotic user as provided in section 11722, the Legislature intended to provide the arrested person with the "right to refuse" to take the Nalline test. ▉ Accordingly, since such right would be rendered valueless if the test could nevertheless be given without the arrested person's consent, we conclude that the Legislature has by the enactment of section 11723 made inadmissible in evidence all Nalline tests given in situations encompassed within the statute but without written consent.[6]

---

[6]The author of the article entitled *Nalline as an Aid in the Detection and Control of Users of Narcotics,* 48 Cal.L.Rev. 282, 289, suggests that

In the instant case, however, we are particularly concerned with the admissibility in evidence of the fact of the *refusal* to submit to the Nalline test rather than with the admissibility of the results of the test. In *People* v. *McGinnis,* 123 Cal.App.2d Supp. 945 [267 P.2d 458], the Appellate Department of the Los Angeles Superior Court held that when a person has been arrested for drunken driving, his refusal to submit to an intoximeter test is conduct that tends to show a consciousness of guilt and is admissible in evidence against him. In reaching this conclusion the court analogized the situation to other situations in which the defendant's conduct reveals a consciousness of guilt, for example, by flight (*People* v. *Anderson,* 57 Cal.App. 721, 727 [208 P. 204]); the use of an alias (*People* v. *Liss,* 35 Cal.2d 570, 576 [219 P.2d 789]); or making contradictory statements to conceal the true facts (*People* v. *Gentekos,* 118 Cal.App. 177, 182 [4 P.2d 964]).

The same conclusion was reached in *People* v. *Dawson,* 184 Cal.App.2d Supp. 881 [7 Cal.Rptr. 384], wherein it was held that both the police and the arrested person are entitled to a prompt intoximeter test, and that if the arrested person refuses to take the test the fact of refusal may be proved at the trial and the prosecution is entitled to an instruction to the jury as to the inference which may be drawn from the refusal. ■ It is apparent, therefore, that *McGinnis* and *Dawson* invoked the "admissions by conduct" exception to the hearsay rule that in criminal cases acts of an accused designed to escape arrest, trial or conviction afford an inference of consciousness of guilt and are receivable against him as implied or tacit admissions. (See Witkin, Cal. Evidence (1958) § 240, p. 273, and cases therein cited; McCormick, Evidence (1954) § 248, p. 532; 2 Wigmore, Evidence (1940) §§ 275 et seq., p. 111.) This rule of evidence is firmly established in California. (See *People* v. *Simmons,* 28 Cal.2d 699, 712 [172 P.2d 18]; Witkin, *supra,* §§ 235, 240, pp. 266, 273, and cases therein cited.)[7]

Since the California courts are committed to the view that the privilege against self-incrimination is limited to testimonial compulsion, and that this privilege therefore does not encompass the use of evidence which is obtained by means of

under this interpretation of section 11723 a Nalline test conducted without written consent might be considered an unlawful search and seizure and therefore inadmissible in California under *People* v. *Cahan,* 44 Cal. 2d 434 [282 P.2d 905, 50 A.L.R.2d 513].

[7] Cf. *Simmons* and *People* v. *Cockrell,* 63 Cal.2d 659, 669-670 [47 Cal. Rptr. 788, 408 P.2d 116], regarding silence as an admission.

subjecting the defendant to a physical examination, it would appear, upon analogy, that the principle declared in *McGinnis* and *Dawson* does not conflict with the constitutional privilege against self-incrimination. Nor, assuming a lawful arrest, does it do violence to due process or to the constitutional protection against an unreasonable search.

We are of the opinion, however, that the principle declared in *McGinnis* and *Dawson* is not applicable in California to the refusal to take a Nalline test. In those cases the person arrested did not have a "right to refuse" to take the intoximeter test. Since he did not have such right, his refusal to take the test constituted conduct tending to show a consciousness of guilt. In the case of Nalline tests a person is given the "right to refuse" by section 11723. Such right, however, would be rendered valueless if the trier of fact were permitted to draw an inference of guilt from its exercise. We hold, therefore, that in the instant case appellant had a "right to refuse" to take the Nalline test and that it was error for the trial court to admit in evidence the fact of appellant's refusal to submit to the test. Since it was error for the court to admit such evidence, the error was compounded when the prosecutor argued the evidentiary effect of such refusal and the trial court instructed the jury that such refusal was a factor it could consider in arriving at its verdict. We are of the opinion, moreover, that appellant did not waive this error by taking the stand and testifying on direct examination that he refused to take the test because it made him ill, since such testimony may have been impelled by the subject evidence.

We now turn to appellant's argument that the evidence of his refusal to submit to a Nalline test was violative of his constitutional rights in the light of *People* v. *Dorado*, *supra*, 62 Cal.2d 338. Following the decision of the United States Supreme Court in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], it was held in *Dorado* that a defendant's extrajudicial statement which was elicited under the following circumstances could not be introduced into evidence: " (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights." (Pp. 353-354.)

In the instant case appellant was under arrest when he was asked to submit to the Nalline test. He was not advised of his right to counsel and to remain silent, nor did he waive those rights. Our immediate inquiry, therefore, is whether the request by the police that appellant submit to the test amounted to a process of interrogation that lent itself to eliciting incriminating statements. We are of the opinion that it did not, and that, therefore, we are not here concerned with the implication of *Dorado* and *Escobedo*. Section 11723 authorizes a law enforcement officer having custody of a person arrested for a criminal offense and suspected of being a narcotic addict to ask such a person whether he consents to taking a Nalline test. Such request, as already pointed out, is in conformity with state policy which provides for such test to assist in the rehabilitation of narcotic addicts and the prevention of continued addiction. Moreover, while the results of the test may have probative value, the sole purpose of the test is not to prove that the person arrested is a narcotic addict and, therefore, knowledgeable in narcotics; in addition, the results of the test can serve to exonerate him by showing that he is not a narcotic addict. Accordingly, we hold that the mere request by the authorities that the person arrested submit to a Nalline test is not a process of interrogation lending itself to eliciting incriminating statements. If he does consent it is not the fact of consent which may be incriminatory but the results of the test. ■ As discussed above, if the suspect takes the Nalline test voluntarily, and no physical or other coercion frowned upon by due process is employed, the results may be brought before the trier of fact because, since the test does not amount to testimonial compulsion, it does not violate the privilege against self-incrimination. On the other hand, if he does not consent to taking the test, his refusal, whether by what he says or his failure to say anything, is not incriminatory. Since he has the statutory right to refuse to take such test, his refusal may not be used against him in a criminal trial.

The applicability of *Dorado* to the situation where a defendant signed a written consent to the taking of a blood test to determine the alcoholic content of his blood was discussed in *People* v. *Bellah*, 237 Cal.App.2d 122 [46 Cal.Rptr. 598], a case involving a prosecution for drunk driving. It was there held that although the police had not advised the defendant of his right to counsel and to remain silent before taking the blood sample from him, evidence of the results of the test was admissible at the trial. The basis for this holding was that

since the defendant was willing to make the effort to convince the arresting officers that he was sober, he "was scarcely in need of legal advice in reaching that decision." (P. 127.) In *Bellah,* the appellate court relied upon *Duroncelay* in recognizing that such a test provided a method of obtaining evidence to prove that the subject was intoxicated and noted that it also could serve to exonerate him by showing that he was not intoxicated.

It is convenient to discuss here appellant's claim of error predicated upon the statement of the trial judge that the case was being tried on the theory that the holding of the *Dorado* case was no longer law.[8] The record discloses that this case was tried after the California Supreme Court had granted a rehearing in *People* v. *Dorado* (Cal.) 40 Cal.Rptr. 264, 394 P.2d 952, decided in August 1964 and before the final decision in said case was rendered in January 1965. However, at the time of trial in the instant case *Escobedo* had already been decided by the United States Supreme Court, and since the principle announced in *Escobedo* is the basis for the *Dorado* rule, both the trial court and appellant were aware at the time of trial of appellant's constitutional right to be advised of his right to counsel and his right to remain silent before any incriminating statement could be elicited from him. As already pointed out, the *Dorado* rule is not applicable to appellant's refusal to take the Nalline test. While appellant makes the broad assertion that it was error for the trial court to make the subject statement and to assume that the *Dorado* principle was no longer law, he fails, other than in relation to the Nalline test, to show in what respects the trial court erred or how appellant was otherwise prejudiced by the statement. It is not our duty to search out error. (*People* v. *Lindsay,* 227 Cal.App.2d 482, 510 [38 Cal.Rptr. 755] ; *Kyne* v. *Eustice,* 215 Cal.App.2d 627, 634-635 [30 Cal.Rptr. 391] ; *Estate of Hoffman,* 213 Cal.App.2d 635, 639 [29 Cal.Rptr. 60].)

█ Assuming that appellant has reference to two statements—one from appellant and one from the codefendant, Miss Jennings—which the record discloses were elicited by the police without the prior admonition of the right to remain silent and to have counsel, we shall consider these two state-

---

[8]Specifically, appellant bases his contention on the following statement made by the trial court: "THE COURT: Let's proceed as though the *Dorado* case had never been heard. We have already committed ourselves—at least I have—and this case is being tried on the theory that the holding of the *Dorado* case is no longer law."

ments in the light of the *Dorado* rule. The statement elicited from appellant by Hilliard was to the effect that the marks on appellant's arms were not from the injection of heroin. The record discloses that this statement, which came before the jury through Hilliard's testimony, was not objected to. Accordingly, since appellant's counsel was aware of the *Escobedo* rule it would appear that appellant has waived the right to urge the principle announced in *Escobedo* insofar as the subject statement is concerned. (See *People* v. *Dorado, supra,* p. 353.) Assuming *arguendo* that there was no waiver in view of the status of *Dorado* at that time, the subject statement, nevertheless, was not within the scope of *Dorado* because it was not incriminating. (*People* v. *Robinson,* 62 Cal.2d 889, 896 [44 Cal.Rptr. 762, 402 P.2d 834] ; *People* v. *Beverly,* 233 Cal.App.2d 702, 716-717 [43 Cal.Rptr. 743].) Although exculpatory in nature, this statement was not the type of exculpatory statement which proved incriminating at the trial because, since it was not shown to be false, it did not constitute evidence of consciousness of guilt. (See *People* v. *Nye,* 63 Cal.2d 166, 175 [45 Cal.Rptr. 328, 403 P.2d 736] ; *People* v. *Hillery,* 62 Cal.2d 692, 712-713 [44 Cal.Rptr. 30, 401 P.2d 382] ; *People* v. *Underwood,* 61 Cal.2d 113, 121 [37 Cal.Rptr. 313, 389 P.2d 937] ; and see 3 Wigmore, Evidence (3d ed.) § 821, pp. 238, 241-242; cf. *People* v. *Williams,* 63 Cal.2d 452, 460-461 [47 Cal.Rptr. 7, 406 P.2d 647].)

Apropos the statement made by Miss Jennings, the record discloses that on cross-examination she was confronted with a statement she made to Hilliard following her arrest wherein she stated she did not know what was in the prophylactic rubbers which Hilliard recovered from the apartment or how these rubbers got into the apartment. These statements were used by the prosecution to impeach her testimony at the trial that it was she, and not appellant, who had obtained the heroin and was using it, and that appellant did not know that the substance was in the apartment. An objection to this statement on the basis of *Dorado* was interposed by counsel for Miss Jennings, but not by counsel for appellant. It was during the colloquy between court and counsel on the propriety of this objection that the trial court made the subject statement to the effect that the case was being tried on the theory that the holding of the *Dorado* case was no longer law. Under the circumstances, it would appear that any objection on the part of appellant's counsel would have been futile and we accordingly conclude that there was no waiver by appellant

of the urging of the *Dorado* rule on this appeal with respect to Miss Jennings' extrajudicial statement.

The record discloses that Miss Jennings was not advised of her right to counsel or to remain silent prior to the time she made the subject statement. In *People* v. *Green,* 236 Cal. App.2d 1 [45 Cal.Rptr. 744], we held that the fact that a statement is used by the prosecution to impeach a defendant rather than as part of its case in chief does not prevent the application of *Dorado.* Accordingly, Miss Jennings' extrajudicial statement was admitted into evidence in violation of her rights under *Dorado.* As to the effect on appellant of this erroneously admitted statement, we note that the jury was admonished and instructed that any statement made by Miss Jennings could only be considered as evidence against her and could not be considered for any purpose against appellant. However, in *People* v. *Aranda,* 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], our Supreme Court held that the admission into evidence of a confession of one defendant obtained in violation of *Dorado* may result in reversal of the conviction of a codefendant where its admission resulted in prejudice to the latter. The rationale of *Aranda* is that it may not be assumed that error in admitting a confession implicating a codefendant is rendered harmless to the nonconfessing codefendant by an instruction that the confession should not be considered against the latter.

In the instant case we are not dealing with a confession implicating appellant, but with an extrajudicial statement which, although not directly or expressly implicating him, was susceptible of the inference that the heroin was brought to the apartment by appellant and that, therefore, he had knowing possession of it. While such statement does not have the shattering impact of a confession which inculpates a codefendant, there is a strong indication in *Aranda* that the principle announced therein is applicable to extrajudicial statements not amounting to confessions, since, in declaring the rules to be applicable in the future in trials of defendants jointly charged with a public offense, the Supreme Court has made those rules applicable to all cases involving extrajudicial statements of one defendant that implicate a codefendant. Assuming, however, that it was error to admit Miss Jennings' extrajudicial statement, its admission was not necessarily prejudicial to appellant; rather, as held in *Aranda,* we must consider whether the admission of this statement resulted in a miscarriage of justice to appellant.

 Appellant's final contention is that certain circumstantial evidence was improperly admitted into evidence. Appellant refers to testimony by Hilliard of his observations while he maintained a surveillance of defendants' apartment on the evening of July 17, 1964 prior to appellant's arrest. Hilliard testified that he observed an automobile drive up to and stop in front of defendants' apartment house; that three people from the automobile entered the apartment building and came out 15 minutes later; that as the automobile drove away, the officers stopped it. At this point in Hilliard's testimony, the district attorney, outside the presence of the jury, offered to prove that these three persons were recognized as narcotics users, that they were stopped and their arms were inspected, and that they all had fresh needle marks on their arms. The trial court, however, sustained the objection of defense counsel to this testimony on the ground that it was too remote and prejudicial. It is apparent that the prosecution attempted to introduce this testimony for the purpose of allowing the jury to infer that sales of heroin were taking place in defendants' apartment. However, the effort on the part of the prosecution to show such sales was clearly frustrated when the trial court denied the district attorney's offer of proof. Accordingly, the portion of Hilliard's testimony which became part of the record and to which appellant now objects was merely foundational. Its admission did not constitute error. Moreover, it in no way prejudiced appellant's case.

 In summary, we conclude that there is not a reasonable probability that the trier of fact would have reached a result more favorable to appellant had evidence of appellant's refusal to take the Nalline test been excluded, nor would a more favorable result have been reached if the trial court had excluded from evidence Miss Jennings' statement that she had no knowledge of the contents of the prophylactic rubbers or how they got into the apartment. (Cal. Const., art. VI, § 4½; *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].) The fact of appellant's refusal to submit to the Nalline test was admitted to show his knowledge of the fact of the possession of heroin and its narcotic character. (*People* v. *Davis, supra,* 231 Cal.App.2d 180, 186; see *People* v. *Winston,* 46 Cal.2d 151, 158 [293 P.2d 40]; *People* v. *Redrick,* 55 Cal.2d 282, 285 [10 Cal.Rptr. 823, 359 P.2d 255].) Similarly, Miss Jennings' extrajudicial statement was susceptible of the inference that appellant possessed this knowledge. The record in

the instant case reveals, however, other substantial evidence indicating that appellant had such knowledge. Not only was appellant present in an apartment where a considerable quantity of heroin was found, but the record discloses the following: Both Hilliard and Dr. Adams noticed that appellant had needle marks on his arms; appellant's trousers contained a powdery substance which was identified as heroin; when the police entered defendants' apartment, they saw appellant standing by the dresser making chopping motions with a knife in his hand; according to the testimony of Hilliard, who was established by the prosecution to be an expert witness in the field of narcotics, when an individual is preparing to use heroin it is very often chopped up in this manner; when appellant saw the police he "scooped up" the items on the dresser top and fled to the kitchen; and finally, when appellant was subdued and handcuffed in the kitchen a kleenex containing heroin and a coin purse containing narcotics paraphernalia were found on the kitchen floor. With respect to appellant's flight from the bedroom to the kitchen this act afforded an inference of consciousness of guilt and was receivable in evidence against appellant as an implied admission. (*People* v. *Santo,* 43 Cal.2d 319, 327, 330 [273 P.2d 249]; *People* v. *Cooper,* 81 Cal.App.2d 110, 116-117 [183 P.2d 67]; Witkin, *supra,* § 240, p. 273.) Since from this evidence the jury was entitled to infer that appellant was in possession of the subject heroin and that he knew its narcotic nature, we are satisfied that both the evidence concerning appellant's refusal to submit to the Nalline test and Miss Jennings' extrajudicial statement were, as to this point, merely cumulative.

The judgment is affirmed.

Sullivan, P. J., concurred.

SIMS, J.—I concur in the affirmance of the judgment, but reserve judgment on the proposition that no inferences may be drawn from an accused's failure to give consent to a Nalline test which is offered him under the provisions of section 11723 of the Health and Safety Code.